## THE KIMBERLEY.

### BAKER SALVAGE CO. *v.* THE KIMBERLEY.

(*District Court, E. D. Virginia.* June 16, 1888.)

**1. SALVAGE—AWARD.**
    The steamship K., valued, together with her cargo, at $490,000, was stranded on December 1st off False Cape shoals, Atlantic coast. The vessel was 350 feet long, 3,760 gross tonnage, and had been driven 3,000 feet from deep water, and thrown high upon the shore, broadside to the sea, and imbedded in the quicksand,—a most perilous position. The libelants came at once to her rescue, and finally succeeded in getting the vessel off on January 26th. Some nine vessels, valued at $164,000, were employed in the service. The vessels and men incurred serious and continued risks on account of storms off that coast. A large part of the cargo was moved 2,000 feet in surf-boats; it being impossible to get a larger vessel near the K. The K. was so filled with water as to render her engines useless, and very little assistance was received from her. The libelant's actual outlay was $46,000. *Held,* that, in addition to the *quantum meruit* allowance, libelant was entitled to one-fifth of the value saved, viz., $98,000.

2. SAME—INCORPORATED SALVAGE COMPANIES.
    An incorporated wrecking and salvage company may be granted salvage awards as liberally as natural persons so engaged.
3. SAME—RELEASE OF RIGHT TO MERITORIOUS AWARD.
    An agreement between the salvors and the agents of the vessel in distress that the salvors shall proceed to save the cargo and vessel, if possible, the compensation to be subsequently fixed by arbitration or the court, at the option of the vessel, will not bar the salvor's right to receive a meritorious award.

In Admiralty. On a libel for salvage.

*Sharp & Hughes*, for libelant.

*Butler, Stillman & Hubbard*, for the underwriters.

HUGHES, J. The steam-ship Kimberley, a British vessel bound from New Orleans to Liverpool, by way of Hampton Roads, for coal, laden with 8,000 bales of cotton, 15,086 bushels of corn, and 24,153 bushels of wheat, was stranded, near midnight on Thursday, December 1, 1887, in a heavy storm, on the Atlantic beach, at False Cape shoals, off Currituck county, N. C., about 1½ miles south of the Virginia state line, near the United States life-saving station No. 6, 30 miles south of Cape Henry. The ship was 350 feet long, 41 feet wide, and 33 feet in depth of hold. Her gross tonnage was 3,760, and net tonnage 2,464. She had been driven by force of wind and tide, when beached, 3,000 feet from deep water, across two reefs of sand, and thrown high upon the shore, where she lay, out of the water as to her bow, and in only five feet of water as to her stern, but imbedded in the sand 15 feet 6 inches aft, and 17 feet 6 inches forward. She lay broadside, heading southward, at an angle of 16 deg. with the beach. She lay on a bottom of quicksand, which at False cape is commixed with a broken layer of yellow clay and roots of trees, which once formed a promontory of land that has been undermined and sunk by the sea, and forms a lumpy bed, from which the extrication of a ship of large size is more difficult than from a bed of unmixed sand. The danger of going to pieces in such a position was very great to the ship. It was a season of the year when high seas were constantly running in, and breaking upon the beach. These waves, coming against the broadside of the ship, along a space of 350 feet, would part, and rush with great force around each end of the ship, washing the sand and *detritus* from under the ends, and leaving a bank under the middle parts. This action of the water on that coast subjects a loaded ship to great strain, and to the danger, under the strain, of hogging, breaking up, and going to pieces. The strain upon the Kimberley was very great, as explained in the evidence. I went myself aboard of her when she was lying at a wharf in Norfolk, and observed, besides the evidences of strain given by witnesses, that the upright solid iron posts, some four inches in diameter, which stand one above the other between the different decks amidships, are several of them very much bent from the pressure which they sustained. Nothing but the extraordinary strength of this strongly built iron vessel prevented her from breaking in two when lying at the beach. The presence of roots of trees and lumps of clay under the Kimberley lessened the danger of hogging, but made it much more difficult for the

salvors, when they took hold of the ship with their cables and winches, to slue her around, stern or bow to sea, and to draw her seaward from her perilous position. When the ship was beached, all her crew abandoned her, and sought safety in the life-saving station which has been mentioned, except her master, her mate, and two engineers, who, except the master, afterwards entered into the service of the salvors. Such is the physical condition of the country in shore at False cape that saving the cargo by landing it on shore was not practicable, or for a moment thought of. Information of the stranding was given from the life-saving station by telegraph to Norfolk, and was by the signal service officials of the United States communicated to the salvors on Friday, December 2d, the day after the disaster, after 11 A. M. Thereupon the salvors' steam-tug, the Victoria J. Peed, was dispatched to the help of the Kimberley, under command of Capt. Charles L. Nelson, a skillful and experienced wreck-master and mariner, with a full complement of seamen and wreckers and wrecking implements and appliances. On board the Peed were also Capt. Lauder, agent of the underwriters at Norfolk, and a clerk in the office of the British consul at Norfolk. The Peed duly reached the vicinity of the stranded steamer, and Capt. Nelson at once reported to the salvage company at Norfolk the situation of affairs, and indicated the measures necessary to be taken. The sea was too heavy, and the water of too little depth, for the Peed to approach within 2,000 feet of the Kimberley then, or at any time during the salvage service. On the 3d December, Saturday, the following contract of salvage was signed at Norfolk between the Baker Salvage Company and Mr. Barton Myers, agent of the Kimberley and her owners.

"NORFOLK, VA., Dec. 3, 1887.

"It is this day agreed between Barton Myers, agent for the steam-ship Kimberley and owners, and the Baker Salvage Company, that the said Baker Salvage Company shall proceed to save the cargo of the said steamer Kimberley, and to save the vessel, if possible, and, failing this, to strip her and deliver the cargo, or so much thereof as may be saved, at Norfolk, and the vessel, if saved, at Norfolk or Baltimore or Philadelphia, whichever port the owners of said steamer elect; for which services it is agreed that the said salvage company shall receive such compensation as may be hereafter awarded them by the United States admiralty court, or by a board of disinterested arbitrators, composed of three men familiar with maritime affairs; one of said board to be chosen by the Baker Salvage Company, one by the owners or agents of said steamer, and a third selected by the other two members; the award of said arbitrators, or any two of them, to be final and binding on both parties to this agreement. And it is agreed that the owners of the said steamer Kimberley shall have the right to elect whether the salvage shall be fixed by the United States court, or by said board of arbitrators, as above. It is further agreed that said salvage company shall employ such of the crew of the said steamer as may be suitable and qualified for laborers, and pay the steamer for them the same rate of wages as paid other unskilled labor, and afford free transportation to the crew to Norfolk on the salvage steamer's coming up.

"Given under our hands and seals at Norfolk on the date above written.

"BARTON MYERS, Agent S. S. Kimberley. [Seal.]
"THE BAKER SALVAGE COMPANY,
"By D. J. TURNER, Jr., Prest. [Seal.]"

From the time of the stranding until December 7, 1887, the weather was exceptionally severe, and the state of the weather and of the sea did not permit any operations under the contract.    There were communications by signal between the Kimberley and the steam-tug Peed, and the Peed returned to Fortress Monroe temporarily.    The salvors soon dispatched the steam-tug Sampson and the schooners Emily Johnson and Annie Collins to the place of the stranding, and the salving enterprise was put in charge of Capt. O. S. Baker; Capt. Nelson commanding the Peed.    On the morning of December 7, 1887, the Peed towed the schooner Collins to within 2,000 feet eastward of the steam-ship, and anchored her there; and thereafter the following named steam-tugs and schooners were engaged in the operations hereinafter described:    The Victoria J. Peed, value $30,000, owned by the salvors, continued in service until January 26, 1888; the steam-tug Sampson, value $30,000, chartered by the salvors; the steam-tug Slater, value $30,000, chartered; the schooner Emily Johnson, value $10,000, chartered; the schooner Bengal, value $2,500, chartered; the schooner E. G. Irwin, value $6,000, chartered; the schooner John R. Fell, value $24,000, chartered; the schooner Minnie and Gussie, value $18,000, chartered; the schooner Annie Collins, value $2,500, owned by the salvors, served until the 26th of January.    All the schooners, whether chartered or owned by the salvors, served as lighters.    The hire of the chartered vessels covered the pay of their crew and their running expenses.    The salvors also used, from time to time, as occasion required, surf-boats, steam-pumps, anchors, and other equipment belonging to themselves.    On the 7th of December, Capt. Nelson, of the Peed, proceeded with some of his men to the Kimberley, and found her headed in a southerly direction, lying nearly broadside to the beach, her bow being nearer to the land than her stern, as heretofore described.    She lay in a mixture of clay and sand, and was so high on the beach that at low water her starboard side, from the stem half-way to the bridge, had no water against it, her stern lying in about five feet of water.    She was considerably listed to the sea.    The method pursued by the libelants in saving the Kimberley and her cargo was the same as that which they had successfully adopted in the numerous instances in which they had saved vessels and cargoes on the dangerous sea-board of Virginia and the Carolinas.    Their first aim is to relieve the stranded vessel from the danger of breaking up, and thumping to pieces on the bottom, by planting anchors at suitable distances out to sea, connecting the ship in distress to them by strong cables or hawsers, and then, by drawing or heaving hard upon these by means of engines and winches on board, holding the ship firm against the beating surf, and bringing her around as soon as practicable, stern or bow to seaward, placing her in a position of the least danger from the action of the waves.    In the case of the Kimberley, the salvors lost no time in planting anchors, and getting out one or more hawsers, and thereby securing control of the ship, and relieving her from the more serious dangers from the waves incident to her position; but so high up upon the beach had the Kimberley been cast, so deeply imbedded had she become in the sand, clay, and roots, and so great were

her size and her weight, from cargo and water in the hold, that it proved a tedious and difficult task to slue her around with stern to sea. This operation, as it was one of the most important, was also one of the most difficult and tedious, in the salvage operations. The plan of operations usually pursued by these salvors, after thus securing control of the vessel with anchors on the hawsers, is to lighten the vessel by pumping out the water she may have shipped, and getting out her cargo as rapidly as possible, all the time heaving upon the cables, until the ship, gradually lightened of her cargo, and gaining deeper and deeper water, is finally floated and taken into harbor.

In regard to the character of the danger which besets vessels stranded upon our southern Atlantic sea-board, I repeat in substance here what I said in the case of *The Sandringham*, 10 Fed. Rep. 562, and 5 Hughes, 316, a large British steamer which was stranded in the winter of 1880–81 on the beach south of Cape Henry, a few miles distant from False cape, the site of the Kimberley's disaster: "All the Atlantic beach, from Cape Henry to the capes of Florida, is quicksand; that is, a fine-grained, loose sand, into which a ship sinks by her own weight as soon as the water retreats from her bottom,—retreats from under it by the action of the currents of the ocean,—leaving a bed, into which a ship sinks deeper and deeper the longer it remains in position. There is no possibility of any substance which, in specific gravity, is too heavy to float upon the surface of the water, being lifted out of its bed in this sand and floated, except by outside appliances. All the vessels that are beached upon the sands of this long coast invariably continue to sink deeper and deeper, until they disappear from sight under the sea into the sand. Such quicksand, while it promotes the sinking out of sight of a vessel stranded upon it, also facilitates salvors in hauling the ship off the beach, so as to float her in deep water; which operation is most facile during heavy seas. The agitation of the sea, and of the movable sand, when gales and ocean swells are rolling upon reefs, forming breakers, and mingling the sand with the water, tends to lift the ship to some extent in her sea-dock, surrounded by sand, and lessens resistance to the operation of heaving on the cables. At the same time, such restless condition of the sand and sea greatly endangers the ship, as long as she is not afloat, by causing her to thump and pound heavily upon the hard sand bottom, and thus to leak badly, and eventually to break to pieces,—a danger from which her only escape is through the skillful exertion of expert salvors, with their wrecking apparatus and appliances." But the texture of the beach off and to southward of False cape near the shore, at the point where the Kimberley was found by the salvors on the 7th day of December, 1887, differs from that which I have described, and is peculiar. False cape was originally high land. From it the stormy seas had gradually abraded and washed away the top soil, leaving the clay bottom shoals, called "False Cape Shoals," into which stumps and roots of forest trees still penetrate. Of course, such an exceptionally stiff and tenacious bottom aggravated the difficulty of hauling the ship seaward, and it further increased the danger, since it involved heaving on the cable in rougher seas and winds; since such a bed or bottom, by reason of

its tenacity, is little agitated in weather that is generally more safely adapted to hauling a vessel off the quicksand.

The Kimberley, when boarded by the salvors on the 7th December, was found to have a very serious leak, which was undiscoverable. One of the greatest dangers to a stranded vessel and her cargo is water from leakage. It tends, by its weight, to break the ship in two, and thus to scatter the cargo, and fill it with sand and grit. It makes the ship heavier and harder to move. The very large water ballast tank of the Kimberley, located beneath the general cargo, was filled with cotton,—a fact which rendered it impracticable to lighten the ship by pumping the water out of the tank, and which put the salvors at a great and unusual disadvantage. When they first boarded the ship, the salvors were informed that the water had been 16 feet deep amidship. Further examination showed that it was as much as 14 feet deep in the engine-room after the salvors came on board. On December 8th, Capt. Baker commenced to set up his steam-pump No. 1, brought aboard on the 7th, and to clear out the engine and boiler rooms. On and after December 10th, the ship's pumps were kept running, day and night, continually, and every day. On the 9th, Capt. Baker's pump cleared the water away from the ship's donkey-pumps, which were set up in the boiler-room. On December 12th, Capt. Baker's steam-pump No. 1 reinforced the ship's donkey-pumps, and cleared the water out of engine and boiler rooms. On the 25th December, on 27th December, and on January 1, 1888, Capt. Baker's steam-pump No. 1 pumped out the ship. On January 2d, the water rose to within two inches of the grate-bars of the ship's donkey-boiler, and the first Baker pump then pumped out the ship. On January 3d, the second Baker steam-pump was set up in the No. 4 hold, and pumped the water four feet down. After that day, Baker's pump No. 2 was worked continuously in the hold; more and more discharging the water, as cargo would be removed from it. On January 16th, Baker's steam-pump No. 3 was also set up in hold No. 4, and used continuously afterwards. These two pumps discharged the water from No. 4 hold, and from No. 3 hold as well; and they thus reinforced the ship's donkey-pumps, operating in engine and boiler rooms. The pumping of water out of the ship's hold went on in this manner until near the end of the enterprise; the ship's own engines being unavailable throughout for the purpose. The ship's engines, in many cases of salvage, give very material aid to the salvors, in heaving on the cable, and thus assisting in drawing the ship out of her sand bed into deep water; but the Kimberley's engines were wholly ineffectual for this purpose until after she had been floated into deep water, and then only for the purpose of helping the Peed and Sampson in towing her into harbor. Nor were the Kimberley's pumps as effectual in rendering assistance to the salvors as is usual. The Kimberley's pumps were not adequate to discharging the water in her hold without being reinforced by the libelant's pumps, even after the salvors, with their pumps, had cleared the engine and boiler rooms of water which had previously submerged the ship's donkey-pumps.

On boarding the ship, the salvors, pursuing the plan of operations

which has been described, laid anchors out to sea, connected with a hawser from the port quarter of the steamer; and on the 12th December laid other anchors out, and connected with them a hawser from the steamer's starboard quarter. There were two reefs of this beach,—one of them about 50 fathoms out from the low-water line, and another a few hundred yards beyond; each of them about 500 feet in width. The rolling of the sea over these reefs in stormy weather made a rough and dangerous surf. There was not depth of water enough on either reef to float any of the schooners which were engaged in the salvage service, and the cargo had to be taken in surf-boats from the steamer to the schooners at anchor off the reefs, about 2,000 feet from the Kimberley. These surf-boats could not be navigated with oars, and were moved back and forth by their crews taking hold of lines stretched between the Kimberley and the schooners. This was a rough and dangerous procedure in all the weather and seas that occurred between the 7th December and the 26th January, the period during which this salvage work was performed. There were frequently recurring storms and gales, more or less severe, while the salving operations under consideration were going on. These would have been fatal to the Kimberley, but for the fast and firm hold upon her which Capt. Baker maintained with his hawsers, and by which the ship was held firmly to the sea. During these high winds and seas the men might have lived while working the surf-boats, but the cargoes would have been lost, and the work was for that reason periodically suspended. The surf-boats were actually at work for 18 days in December, and for 10 days in January. As many as 5 surf-boats were used, never with room for oars, always over 2 long lines of breakers, and over a continuous space of 2,000 feet, except as the distance was lessened by the gradual progress of the Kimberley seaward from the beach.

This work of discharging cargo continued from December 7th until the 15th of January, during which time 7,408 bales of cotton, and about 740 bushels of wheat, were in that way brought up to Norfolk. The cotton reached Norfolk as follows: December 10th, 250 bales; December 14th, 560 bales; December 15th, 421 bales; December 17th, 209 bales; December 19th, 50 bales; December 20th, 539 bales; December 21st, 138 bales; December 22d, 275 bales; December 23d, 618 bales; December 24th, 150 bales; December 29th, 500 bales; January 2d, 525 bales; January 5th, 833 bales; January 9th, 1,317 bales; January 10th, 374 bales; January 14th, 187 bales; January 15th, 456 bales. The cargo had been surf-boated from the Kimberley into the schooners on such days in December and January, up to January 15th, as the weather and sea would permit the work to be done with safety to the cargo. As the cargo was taken out and the vessel lightened, the libelants, by means of the steam-ship's steam-winches, hauled on the cables which had been extended from the port and starboard quarters. On the 2d of January they hauled the steamer astern about 40 feet. Prior to that date, owing to the difficulties which have been described, the location of the vessel had not been materially changed from that occupied when the libelants came aboard on December 7th, though very strenu-

ous efforts had been made at times to move her. On the 13th January she was again hauled a few feet, and on the 14th she was hauled 27 feet. On the 15th of January she was hauled 13 feet, on the 16th 40 feet, and on the 17th about 80 feet. On the 18th of January she was hauled 100 feet, and on the 19th 70 feet. On the 21st of January, and thereafter almost daily, she was hauled material distances, until on the 26th of January, during an exceptionally high tide, she was floated, and then proceeded in tow to Norfolk, assisting with her own engines, and taking with her 585 bales of cotton, about 15,000 bushels of wheat, and about 5,000 bushels of corn.

As before stated, the schooners were not able at any time to go alongside the Kimberley to take cargo from her, but lay at anchor about 2,000 feet from shore. The steam-tugs assisted in towing the schooners to Norfolk; one or the other of the tugs, however, remaining almost constantly at the place of anchorage for the protection of the schooners. The salvors employed such service as was necessary for discharging and surf-boating and transporting the cargo to Norfolk, and in doing such other work as their contract called upon them to perform. Including the crews of the chartered vessels, they had 132 men in service. The amount paid by the libelant for labor was $11,394.44, and besides this they paid the wages of the crew of the steam-tug Peed and schooner Annie Collins. The libelants also expended, in addition to the charter hire above noticed, and the labor bills, $4,658.66 for supplies, tools, and materials used in their work. Some of the tools and materials were not used up, and remain in the hands of the libelants. The total cash expenditures of the libelants for the chartered vessels, labor, and supplies was $26,039. Add to this expense those incident to the Peed, the Annie Collins, and to other service than that performed by the chartered vessels, and the *quantum meruit* outlay of the salvors reached $46,000, as hereafter indicated. The Kimberley arrived at an anchorage in Norfolk on the 26th of January, and thereafter discharged such cargo as remained in her. Later, the master of the steamer, under the rights secured to him in the contract made with the libelants, took delivery of the steamer at Norfolk, and elected to have the amount of the libelant's compensation determined by this court, and not by arbitration. The value of the Kimberley, her freight, and her cargo, as saved, has been fixed by consent of parties at $490,000.

The determining and distinguishing features of this case are numerous,—the great size of the Kimberley; her draught of water; the weight of her cargo; her length; the remarkable depth she was imbedded in the sand and clay, exceeding that of any other ship within my knowledge or reading, similarly stranded; her proximity to the shore, and partly on dry land, while drawing 23 feet of water aft, and 20 feet forward; the great distance from deep water; the level shore; the lumpy bottom; the clay shoal, and the fact of two parallel lines of reefs or breaker lines, to obstruct and imperil the surf-boating; the unusual quantity of water in the ship, and all of it aft of the engine-room, with its exceptional depth, which rendered the ship's pumps useless by submerging her

donkey-engines; the character of the weather, which, on that coast, made often a continuous line of breakers from the steam-ship to deep water,—a space of 3,000 feet and more; her bearing to the beach, nearly broadside, and the unexampled difficulty attending the sluing her around, on clay, roots, and sand; the unusual number of cotton bales in the ship, and the necessity for surf-boating them 2,000 feet, through continuous lines of breakers,—always over two breaker lines, each of them wide; an unusual number of "severe storms and gales," more or less endangering life and property; the small assistance from the ship's company; the fact that the salvors received no assistance from the ship's engines until after she was floated off the shoals into deep water; the most tempestuous season of the year; length of the transportation line for lighters, protracted by the necessity of removing so large a cargo, while the weather did not permit a schooner ever to come along-side; the extent of the leak, involving constant pumping; the skill manifested in making a perfect success, when not even the brave master of the ship had the hope or expectation of saving her.

It is hardly necessary to speak specifically of the dangers which attended this salvage service. That the Kimberley and her cargo was in danger of utter and irretrievable loss is attested by the fact that all of her numerous crew, except four brave men, abandoned her to save their lives. There was danger on the Kimberley to numerous lives in the event of her breaking to pieces in any gale; in which case the salvors could not have reached the shore or the Peed in surf-boats. There were many days in which a surf-boat could not make a single trip without danger, in receiving, transporting, or delivering the cotton bales and bags of grain. There was danger on the Peed, which lay outside nearly two months, in all weather, to move lighters inshore and out to sea, to hoist cotton bales on the lighters, and, in case of storms, to take care of the lighters, and as a place to keep extra men and relays. There is always risk on this beach. The supreme court (8 Wall. 454, in the *Camanche Case*) declared the "risk to be great and constant" in the harbor of San Francisco, in a harbor wrecking case, because divers did the work. Much more perilous is surf-boating on the ocean in midwinter. It is useless to urge that no lives or even property were actually lost. Nobody was killed on the Camanche; yet the court held "the risk to be great and constant." The fact that no one was killed on the Kimberley does not show, any more than in the *Camanche Case*, that the danger was not great, nor the work difficult. But it does show the skill and expertness of the salvors; their perfect success in achieving one of the most difficult salvage operations recorded in the proceedings of admiralty courts. In the *Camanche Case* the court held that the bounty allowed by the court below was not excessive, considering the skill required to perform the work, the expense incurred, and the time and labor spent; all inferior to what was done here.

In illustration of another important feature of this case, I will repeat what I said of salvage services on this coast in the case of *The Taylor Dickson*, 33 Fed. Rep. 886, which I do, not only with reference to surf-

boating for the unusual distance of 2,000 feet across two lines of break-ers, under circumstances of constant hardship to men, and exposure to men, boats, and cargo, in the depth of a severe winter, but with refer-ence to the peril to the schooners, steamers, and their crews engaged in this salving enterprise, which had to lie off that coast for the long period of 54 days, taking the risk of sudden storms, such as had surprised and seized the great ship Kimberley, and driven her 3,000 feet over two great sand-bars, and stranded her upon the edge of the beach; such as had, a few years ago, overtaken and surprised the scientifically navi-gated steamer Huron, of the United States navy, and destroyed her, with nearly all on board; and such as had, a year before, taken unawares the large German ship Elizabeth, and driven her ashore, destroying ship and cargo, and not only all her crew, but several brave men also who had gone to her assistance from a life-saving station just above that near which the Kimberley was stranded.

"This is not a sea-board studded with harbors and prosperous commercial cities and towns, from which salvors may run out short distances along-shore, and render successful services in a few hours. It is a long coast, dangerous and barren, constantly swept by strong winds and currents, where the ordi-. nary tide varies only three feet, and on which wrecking enterprises are at-tended with constant risks and peculiar difficulties. Wrecking service here can only be successfully performed by organized capital, enterprise, and skill, so organized as to be capable of sustaining a constant provision of experienced mariners, powerful wrecking vessels, and ample wrecking implements and material, ready at all hours for immediate service. The business cannot sus-tain itself in the hands of reputable men and companies unless the admiralty courts shall give exceptionally liberal rewards in all cases of meritorious service on this sea-board. And surely it is in the interest of commerce to sustain the wrecking business in these waters and latitudes. I earnestly maintain that salvors on this coast should be more liberally dealt with by ad-miralty courts than on coasts north of us."

This was a repetition, in substance, of a declaration of which I was then ignorant, made by the late Judge MARVIN, of the Florida district, a learned author, and one of the soundest admiralty jurists which our country has produced. The passage is found in Cohen, Adm. 131. Judge MARVIN said:

"What would be no more than reasonable on this coast, where so many, shipwrecks occur, and where the assistance of so few transient or trading ves-sels can be had to save the property, and where, consequently, the employ-ment of a number of regular wrecking vessels has been found necessary for that purpose, might be unreasonably large in the neighborhood of commer-cial ports on the coast of England or the United States, or in any place where regular wrecking vessels were unnecessary, because wrecks were fewer, and the assistance of transient persons or vessels could be more easily obtained."

From Norfolk to the place where the Kimberley lay was 60 miles; from that place to within the capes of Virginia the distance was 30 miles. Schooners could not be got to go out upon that coast unless at-tended, going, staying, and returning, continually by steamers. It is a coast of surprises and ever-recurring dangers, and salvage service ren-dered upon it cannot justly be dwarfed to the grade of mere *quantum*

*meruit* work. It would not be in the interests of commerce to do so. Counsel for the Association of Underwriters, who conduct the defense in this case, seem to treat the saving of the Kimberley and her cargo as if it had been a work of mere labor and time, attended by no other circumstances of danger, risk, or merit than would have belonged to it if it had been performed in Hampton Roads, or in the lower harbor of New York,—performed on a theater of absolute security. I cannot look at the case in such a light. I consider such a view of it as wholly inadmissible. Not to rank the saving of the Kimberley and her cargo on that coast, in the perfectly skillful and successful manner in which it was done, as a case of extraordinary merit, deserving of the highest commendation, would be to ignore all that has been said in praise of courageous and successful salvage enterprise since the beginning of the admiralty jurisprudence.

Having stated in detail the facts which constitute the distinguishing features of this case, I come to consider it in its legal aspects, and with direct reference to the award proper to be made by the court. Salvage consists—*First*, of an adequate remuneration for the actual outlay of labor and expense made by the salvors; and, *second*, of the reward, as bounty, allowed from motives of public policy, as a means of encouraging extraordinary exertions in the saving of life and property in peril of the seas. The first of these items of award admits of computation; the second does not, and is usually determined with more or less reference to the value of the property saved. In respect to the first branch of the award, I have no difficulty, and have previously stated it to have been $46,000.

It remains to determine what should be the amount of bounty accorded to the salvors in this case. Their service was one of extraordinary merit. There were (1) great danger, from which the property saved was rescued; (2) great value ($190,000) in the property saved; (3) serious and continual risk incurred by the salvors and their property; (4) great value ($164,000) in the property that was put at risk; (5) extraordinary skill and perfect success in rendering the service; and (6) much time and labor spent in the enterprise. These six ingredients, usually held to constitute a salvage service of the highest merit, all entered conspicuously into the °enterprise under consideration. I have said that the bounty awarded to salvors is usually determined with more or less reference to the value of the property saved. In most cases a proportion is awarded, larger or smaller, according to the merit of the service; for it is not true, as contended by counsel for the underwriters, that the rule of percentage or proportion has been abandoned by the courts in cases of salvage service. It is true that in a certain class of cases which come into the admiralty courts—which, indeed, is a very large one—these courts refuse to estimate rewards by proportions. But this disposition is confined to cases which, while containing some ingredients of salvage service, are, in their main features, cases of mere towage. Towage is not salvage; and, when considered by itself, is never compensated except on the basis of *quantum meruit pro opere et labore*. Of course,

when this rule of compensation obtains, the value of the property towed is but slightly, if at all, considered by the courts, in determining the compensation to be awarded. A case of this sort was *The Amerique*, L. R. 6 P. C. 468, cited on the brief of counsel for the underwriters. In that case the vessel was found a few hundred miles out at sea, abandoned, with some little water in her hold, and was towed and navigated into port. It was a French steamer, that had been deserted in a panic. The fact of being abandoned, and of having a little water in her hull, were the only salvage ingredients in the case. In its prominent features it was a case of mere towage; of easy, safe, and inexpensive towage. The court below was held, by the lords of privy council on appeal, to have erred by giving too much consideration to the salvage features of the case, and by overlooking the fact that it was little else than a case of towage; and the lords reduced the award to about one-tenth of the value saved. I state the result of their decision; not its language. Neither does the case of *The Thetis*, 3 Hagg. Adm. 14, 2 Knapp, 390, cited by underwriters' counsel, teach the doctrine of a discardal of proportions in estimating awards in salvage cases. There, the property saved was specie treasure which had been sunk in an inlet of navigation in a vessel of the British navy. The salvage service was performed by officers and men of the navy, and consisted in slow and deliberate measures, protracted through more than a year, for recovering the specie; no risk attending the work, except of disease in a tropical climate, and what is incidental to diving operations. The amount recovered was the immense sum of $750,000 of silver. An application of the rule of proportion here would seem to have been repelled by strong considerations of justice. Yet it was applied, in fact if not in form; the syllabus of the case thus describing the award: "One-fourth of the gross value awarded. * * * Gross quantity of treasure recovered, £157,000; the whole sum deducted for salvage, admiralty claim, and for expenses being £54,000." In the case of *The Arendal*, 14 Fed. Rep. 580, (the last one cited by underwriters' counsel,) the bark saved was decided by the court not to have been derelict; which eliminated from the case its principal element of salvage, and rendered it a case mainly of towing,—of towing a sail vessel found drifting in ice five miles off shore, and bringing her into port. Delay, labor, and some difficulty attended the service; and the court held that the circumstances of that case did not call for a large award, estimated by proportions of the value saved, and allowed $2,500 to a public ice-boat for three days' towing.

On this subject of proportions, the cases show generally that the old rule of allowing to the salvors arbitrarily, in every case, half the values saved, no longer obtains. Indeed, that rule came at last to so revolt the courts of admiralty that in their repugnance to it they went far towards the other extreme, and manifested a temper to discard the idea of proportions, and to confine themselves too much in their awards to the *quantum meruit* estimate of salvage services. There has latterly, however, been a recurrence, except in cases of towage, from extreme views in that direction, to the middle ground of adapting the amount allowed

to the circumstances of each case; giving always the *quantum meruit*, and giving also, when the case calls for generous treatment, a liberal bounty, proportioned to the value recovered; taking into consideration, also, the value of property lost; giving a larger proportion where all the property is saved, and a smaller one where more or less of it is lost. In the case of the Kimberley, now under consideration, all the property was saved, and, on that score, would admit of a larger proportion in the award. In my decisions in the cases of *The Sandringham*, before cited, and of *The Egypt*, 17 Fed. Rep. 359, I discussed very fully the doctrine of bounties, and the rule of proportion by which they were determined. In the first case there was no appeal; in the second case, my decision was affirmed on appeal. They constitute, therefore, the law of this court on the subject of bounty and proportion, and I have only to renew now the application of the principles then proceeded upon.

The most plausible objection to bounties is that property saved is used as a fund to stimulate efforts to save life and other property in which the owners of that saved have no interest. This objection cannot be urged with any consistency by the real defendants in this case. The owner of the Kimberley is not here by counsel. Though here in form, he is here in a passive character only. The persons really contesting the claim of the libelants are the board of underwriters. Now, the practice of granting bounties for salvage service is really based on the principle of contribution from the fortunate for the benefit of the unfortunate, which is the principle on which all insurance rests. The dangers of the wild and stormy coast from Delaware capes to the Gulf of Mexico are so great that many vessels are lost in spite of the most arduous and expensive exertions of the wreckers, who lose their labor and property, and risk their lives, in fruitless attempts to save them. So much is this the case that the business of wrecking cannot be carried on at all on the southern Atlantic coast by individuals, and can be prosecuted only by corporations thoroughly organized and equipped with men and material; and these are more frequently engaged upon cases which bring no remuneration than upon those which bring reward. When, therefore, a valuable ship and cargo is rescued from the jaws of destruction by men who have been engaged in numerous losing salvage undertakings, it would not seem reasonable to deprive them of the benefit of an ancient principle of maritime reward, and confine their compensation to the *quantum meruit pro opere et labore* due them in that particular case. The salvors in the case under consideration were a corporation organized under the title of the Baker Salvage Company. It was argued at bar, though I do not find that the point is made in the underwriters' brief, that as salvage awards are personal, and the service personal, the libelants in this case, being a corporation, cannot be recognized as salvors by the court. This point was considered and emphatically overruled by the United States supreme court in the case of *The Camanche*, 8 Wall. 448, and by this court in the cases of *The Sandringham* and *The Egypt*, before mentioned; and it may be accepted as settled law in the United States that an incorporated company, organized for the purpose of engaging in the meritorious work of

saving ships in distress, and devoting themselves assiduously and rep-. utably to that pursuit, may be granted salvage rewards as liberally as natural persons so engaged may be.

Underwriters' counsel make also the point that the fact that the salvage services in the case at bar were rendered under a contract precludes any claim for enhanced reward on the ground of any supposed impracticability that might have existed in December last of procuring the services of other wreckers in saving the Kimberley and her cargo. I have not allowed that consideration to enter into my view of the service rendered in this case. It has not been claimed on behalf of the salvors that they are entitled to a larger allowance on any such supposed ground; and I do not think the fact that there were no other wreckers available but themselves, if it were a fact, should enhance their compensation. I shall not allow it to influence my own award in the case.

In their fifth point, underwriters' counsel remark: "Aside from the fact that the contract under which the services were rendered contemplated that the libelants should receive compensation for their services in any event," the proofs show that they had security always in hand, etc. The same thought is suggested in other passages of the brief. The contract was, in express terms, a contract for salvage, made by the representatives of a wrecked vessel and her cargo, while in imminent peril, with a "salvage" company, to "save" the cargo, and to save the ship herself, if possible, or, failing in this, to strip the ship, and deliver the cargo, or so much as should be saved, at Norfolk, and the ship, if saved, at Norfolk or other place. It was a contract for saving. It contemplated the saving of property. It provided how the "salvage" earned should be fixed and determined. The compensation provided for was to be for saving property, and was to be a salvage compensation. If the contract, in the use of these terms and expressions, contemplated anything more distinctly than another, it was that there was to be no payment except for saving property, and that this "salvage" was to be fixed by an admiralty court, or by arbitration, as the representatives of the ship and cargo might elect. While there is no express clause declaring that nothing was to be paid unless for something saved, the terms used by the contract, in their technical purport, as well as in their ordinary meaning, exclude the idea of anything becoming due to the salvors unless something was saved. I cannot, therefore, entertain the suggestion that there was in this case anything but a salvage contract for a salvage service, upon a salvage compensation, on which nothing would be due or earned unless some of the property in peril of the sea was saved. The supreme court, in the *Camanche Case*, held, expressly and with emphasis, that "nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." The contract under consideration was not a contract to pay a given sum. It was not a binding engagement to pay anything; that being left to arbitration. It was not a contract to pay at all events, whether successful or unsuccessful; for compensation was to

be received only for "saving" property, and was expressly described as "salvage" money. There is nothing, therefore, in this suggestion or contention of underwriters' counsel to prevent the court from decreeing a salvage reward.

In the *Sandringham Case* I awarded a fourth of the values saved. In the case of the *Egypt* I awarded a fifth, and the outlays made by the salvors. The saving of the Kimberley was a more difficult and far more protracted enterprise than either of those. The ship was driven higher upon the beach, and lay imbedded deeper in the sand. Her size was hugely greater, her leakage was greater, and her distance from deep water many times greater, and across two reefs instead of one. All of her cargo, except the little that did not need, at the close, to be taken off, had to be surf-boated. None of it could be discharged upon schooners brought along-side. The value of the cargo was greater, and was all of it saved, except the small quantity of grain that had been wet before the salvors got aboard. The value of the ship was greater, costing to build hardly less than a quarter of a million of dollars; insured for $180,000; and built so strong that I doubt if it is seriously injured. While the valuation of it—$78,000—agreed upon by the parties in interest during her disabled state is conclusive upon me in estimating the pecuniary award that is to be allowed to her salvors, I am not precluded, in the moral view of the case, from ascribing the highest merit to the men who undertook, and successfully accomplished, what was regarded the hopeless attempt to save this great and noble ship.

Estimating the *quantum meruit* allowance due the salvors to be $46,000, and decreeing that amount, I will decree, in addition, one-fifth of the agreed value of the property saved, to-wit, one-fifth of $490,000, equal to $98,000; the total sum decreed being $144,000. The $46,000 above mentioned consists of the sum of $26,000 expended by the salvors upon the chartered vessels and their crews, and $20,000 which I add as proper compensation (say $375 a day) to the salvors for the use in the enterprise of property of their own, consisting of the Peed and Collins, surf-boats, anchors, chain cables, hawsers, steam-pumps, and other material.

NOTE BY JUDGE HUGHES. An appeal was taken in this case on objection to the amount of the salvage award. The delay of the proceeding would have operated so oppressively upon the libelants that they compromised with the underwriters by a heavy discount upon the award, and the appeal was dismissed.