JOHN D. SPRECKELS & BROTHERS COMPANY *v.* THE SHIP "DUNREGGAN," J. E. MACAULEY, Intervenor.

DECIDED: OCTOBER 11TH, 1900.

1. A steel sailing ship having a registered tonnage of 1447 tons net, found by the Court to be of the value of $65,000 before being damaged, and having a valuable cargo, went ashore upon a coral reef encircling Diamond Head about six miles from the port of Honolulu, on the 8th day of August, 1900, at about 9:40 a. m., and remained on said reef until 4:10 p. m. of the 9th day of August, 1900, when, through the combined efforts of the steam tugs Fearless and Eleu and the United States Government cutter Iroquois, she was pulled off the reef, after sustaining damages rendering necessary repairs estimated to cost $25,000, and a loss of cargo jettisoned, of the value of $1,259.40. $12,000 salvage awarded for the services of the three vessels in saving the ship valued at $40,000 after cost of repairs and on $54,366.59 value of cargo and freight saved.

2. Where valuable services were rendered by a United States Government cutter the Iroquois, in conjunction with two steam tugs, in rescuing a steel sailing vessel of 1447 tons net, together with her cargo, from a position of great peril on a coral reef, and an award of $12,000 in full of all salvage in the case is decreed the salvors,

*Held,* that the said Government cutter Iroquois would have been entitled to $3,000 of the said award, had it made any claim for salvage services, but not having done so, said $3,000 inured to the salved vessel and her cargo.

3. Where it was shown that one of the salving tugs, the Eleu, had rendered services to the wrecked vessel on the 8th of August, while- in command of her regular Captain (Hilibus), he agreeing that the same would be charged for at towage rates, but that the spring of the Eleu broke on that day, and she left for Honolulu; and where it was further shown that on the next afternoon, the 9th of August, the Eleu was detailed by the Harbor Master to take out a ship which was going to sea, and owing to the illness of her regular Captain, Captain Macauley was placed in command, and after towing out the ship, went over to the Dunreggan, and being asked by the Captain of the Dunreggan if the Eleu was the same boat that he had made the agreement with the day before, answered "yes," whereupon the Captain of the Dunreggan said, "Give us your hawser, then," which the Eleu proceeded to

do, and worked for some three-quarters of an hour in conjunction with the Fearless and the Iroquois, when the Dunreggan came off the reef; and where it appeared that the Eleu made no demand for salvage services, but settled with the Dunreggan upon a towage basis of $157.70 for the services rendered, and Captain Macauley intervened and claimed an award for his individual efforts in the matter, and where it was claimed by the Captain of the Dunreggan that he had an agreement with Macauley to work upon towage rates;

*Held*, that it is not clear that the Captain of the Dunreggan and Macauley understood each other, or that there was any meeting of minds between them on the 9th day of August in the nature of an agreement; that Captain Macauley was a volunteer when his services were accepted by the Captain of the Dunreggan, and that simply responding "yes" when asked if it was the same boat that the Captain of the Dunreggan had made the agreement with the day before, was not a confirmation of that agreement; that Captain Macauley under the circumstances of this case was entitled to some compensation for the salvage services rendered by him personally as Master of the Eleu, notwithstanding the settlement of the Eleu.

4. Where the evidence showed that upon an examination made by a diver after the Dunreggan was taken off the reef and brought into Honolulu, that "eight of her frames were injured and bent entirely away from the plates....the bottom of the ship was bent in ....and those frames were bent sidewise, the keel forward was slightly to the port side, the rivets in the plates were all spit out and the rudder injured," and that she was entirely unfit to go to sea without extensive repairs; and where it appeared that while the vessel was on the reef there was no immediate danger to life unless a storm had arisen, in which event the testimony bears out the presumption that the ship would have been pressed back upon the reef; and even without the possibility of a storm, the testimony showed that the ship was in hourly danger of swinging round broadside upon the reef and thereby becoming a perfect wreck;

*Held*, that for the saving of life there is no salvage, and that it was not necessary in order to entitle libellant to salvage that some one should lose his life or be in imminent peril of doing so; that if the salvors did all they could to save the ship, and at the same time avoid the danger which a loss of the ship would cause to the men on board, they were entitled to fair and liberal compensation in the event of success.

5. In determining the award to salvors, each case depends largely on its own merits; but it is clear in determining the award, several elements are to be considered; among them are the enterprise and risk of the salvors and value of the property risked; the time occupied in the rescue of the wrecked vessel; the **danger**

and distress from which the property is rescued; the success of the efforts of the salvors and the value of the property saved.

6. No subsequent opinions of the officers of a wrecked vessel, looking backward as to what they might possibly have done to save the vessel, but which they did not do, can in anywise disparage or undervalue what was done by the salvors.

In Admiralty. Claim for Salvage Services.

*F. M. Hatch*, Proctor for libellant; *W. Austin Whiting* and *Holmes & Stanley*, Proctors for respondent; *Paul Neumann*, Proctor for intervenor.

Estee, J.   This is a libel for salvage in the sum of $20,000 on the part of J. D. Spreckels Brothers & Co., the owners of the tug "Fearless" and for the Master and crew thereof, J. E. Macauley intervening with a claim of $2500. The case was submitted to W. J. Robinson, Esq., as special referee for the taking of testimony. Eight hundred and seventy-one type-written pages of testimony were taken by said referee and the facts of the case as disclosed by this evidence seem to be these:

The "Dunreggan," a steel sailing vessel, bark rigged and having a registered tonnage of 1477 tons net, with one G. M. Dixon as Master, sailed from the port of London, Great Britain, on the 14th day of March, 1900, bound for the ports of Honolulu, Hawaiian Islands, and Seattle, Washington, with a cargo of general merchandise for both said ports. Said bark arrived off Diamond Head about six miles from Honolulu on the 8th of August, 1900, and went ashore upon the coral reef encircling Diamond Head at or about 9:40 a. m. of that day.

At about 11 o'clock a. m. of the same day, the tug "Fearless" owned by the libellant herein, Captain Brokaw in command, came out to the ship and after some parleying with the captain as to compensation to be paid him for services to be rendered, fastened a line to the "Dunreggan" and began tugging at the ship to pull her off the reef.

Later in the day, to-wit: about 2 p. m., the "Eleu" came out to the ship, she having been there earlier in the day, and again offered assistance; whereupon in the words of Captain Dixon

of the stranded "Dunreggan," the following conversation ensued:

"I asked him why he didn't strike a bargain with me this morning when he said it was a harbor government tug and that he must not make any bargain. He said that 'all he could charge me was whatever the tariff would be in this port; that was all he could charge me; the tariff in this port for her services. Towage tariff, all that could be charged for her services.' I agreed to that, and I said 'give us your hawser on those terms,' and it was on those terms I accepted."

After agreeing to accept the services of the "Eleu," that tug also fastened to the "Dunreggan" and began pulling in connection with the "Fearless" until about 6 p. m. when her spring broke, she slipped her hawser and left for Honolulu.

The United States Revenue Cutter "Iroquois," also came out with offers of assistance on the 8th of August, but did not succeed in getting a line on the "Dunreggan" on that day. The tug "Fearless" remained by the ship pulling all of the 8th of August, and also the entire night of the 8th, keeping her head to the wind; and continued doing so until 4:10 p. m. of the 9th of August at high tide, when the "Dunreggan" finally came off the reef and was towed into the harbor of Honolulu by the "Fearless." It seems that that tug worked continuously at the vessel save for an interval of about three-quarters of an hour on the 9th when her hawser broke, from the time she first went out to the ship until the "Dunreggan" finally yielded to the combined efforts of the tugs "Fearless" and "Eleu" and the U. S. Revenue Cutter "Iroquois" on the afternoon of the 9th.

The "Iroquois" came out on the 9th of August at about the hour of 2 p. m. and got a line on the "Dunreggan" and acted with the "Fearless" in striving to pull her off, until she finally came off. It also appears that the "Eleu" put in an appearance on the afternoon of the 9th of August about three or three thirty p. m. Captain Macauley, the interventor herein, was then acting as Master of the tug. The "Eleu" was detailed by Mr. Fuller, the Harbor Master of Honolulu, to take out the

ship "Dirigo" which was going to sea, and owing to the illness of her regular captain, Macauley was placed in command. After Captain Macauley had towed out the "Dirigo," he went over to the "Dunreggan." He reached her between two and three o'clock p. m. of the 9th, and when the "Eleu" came alongside of the "Dunreggan," in the words of Captain Dixon of the stranded vessel, substantiated by the testimony of Captain Macauley, before he accepted her hawser, the following conversation took place:

"I wanted to know (said Captain Dixon) whether it was the same boat that I had made the agreement with yesterday (the day before.) He said 'yes.' I said 'all right, give us your hawser then.' That was about a quarter past three or twenty minutes past three p. m.   *   *   "

That upon the acceptance of the tender of the captain of the "Eleu," she fastened her hawser to the "Dunreggan" and forty-five minutes after doing so, all three vessels pulling together, the ship, having in the meanwhile been jettisoned of some eighty tons of cargo, came off the reef at high tide and was towed into Honolulu by the "Fearless" with all her cargo safe on board with the exception of the 80 tons jettisoned.

It is admitted that the value of the cargo and freight of the "Dunreggan" was $54,266.59. This does not include the jettisoned cargo which was valued at about $1259.40. There is some conflict of testimony as to what the ship was worth when she went upon the reef; the estimated value ranging from sixty to seventy-five thousand dollars. It is admitted, however, that she was insured for $55,000 which is a most unusual insurance on a ship worth as claimed by some of the witnesses but $60,000.

It is also admitted that the "Fearless" had a capacity of 812 horse power, and was valued at $75,000; the "Iroquois," a capacity of 1100 horse power and that of the "Eleu," was only from 350 to 400 horse power.

The United States Revenue Cutter "Iroquois," makes no claim for salvage. Captain Pond, her commander, testifying

that "it is not customary for naval vessels to charge for the rendition of such services."

The tug "Eleu" presented the following bill to the agents of the "Dunreggan" in Honolulu, which bill was paid in full, to-wit:

"Bill for services rendered the British bark Dunreggan on August 8th and 9th, 1900.

"August 8th, 1900, while on reef..............$78.85

"To towing August 9th, assisting off the reef...... 78.85

"Total . ...........................$157.70

"Received payment,

"A. FULLER.

"O. K., G. H. DIXON.            Honolulu, August, 1900."

(The A. Fuller referred to was the Harbor Master of Honolulu.) The tug "Eleu" is therefore not entitled to any further compensation.

Captain Macauley, acting master of the "Eleu" on the 9th of August, 1900, makes a personal demand for salvage services rendered by him on the said 9th day of August in the sum of $2500.

The libellants demand salvage in the sum of $20,000 for the services rendered by the tug "Fearless," as well for the master and crew of the tug as for the libellant named.

There was some evidence introduced upon the question of an agreement made between the master of the "Dunreggan" and Captain Brokaw of the "Fearless" as to the award of salvage to the "Fearless" being decided by arbitration in the event the "Fearless" should render services to the "Dunreggan" and succeed in getting her off the reef.

The testimony seems to be conflicting upon this point. That there was some sort of an oral agreement to arbitrate made between the two men there can be no doubt. Captain Brokaw demanded $20,000 for pulling the ship off the reef, to which Captain Dixon demurred; but finally consented that Captain Brokaw should fasten a line to his ship and help him out of his

dangerous position, on condition that if he were not successful he should have nothing; and if he were, it should be submitted to arbitration. To this Captain Brokaw assented, and immediately fastened his line to the ship. No definite agreement was made as to the arbitration, either then or since then, either as to who were to be the arbitrators, whether there was to be an order of Court made in relation thereto or in what way it was to be conducted. The whole arbitration agreement, if it may be termed such, was inchoate. But conceding that there had been an agreement to arbitrate which had failed through the fault of either party, that would not have prevented this Court from taking jurisdiction of an action for salvage in the matter in the absence of any agreement for a fixed sum to be paid at all events. *Coffin v. The John Shaw,* 1 Cliff. (U. S.) 230; The *Kimberley,* 40 Fed. 289; The *Excelsior,* 123 U. S. 40.

It is admitted by all the parties to the action that the "Dunreggan" was in a position of great danger; that the "Fearless" rendered efficient services in rescuing her and her cargo; but as to the services rendered by Captain Macauley while in command of the "Eleu" on the 9th, there is considerable dispute. In this case the matter resolves itself into the two questions of who is entitled to the salvage award and what amount or amounts should be allowed to each party.

The authorities differ greatly on the question of the amount of salvage to be awarded. Each case depends largely on its own circumstances. For that reason it is not easy to obtain much assistance from adjudicated cases; but it is clear that in determining the reward of the salvors, several elements are to be considered. Among them are the enterprise and risk of the salvors, and value of the property risked, the time occupied in the rescue of the wrecked vessel; the danger and distress from which the property is rescued; the success of the efforts of the salvors and the value of the property saved.

A reasonable reward should be allowed to the salvors in all cases where a ship is subject to salvage and where the salvors risk their lives or property and the circumstances show bold and

fearless effort on the part of the salvors. In this case, the ship and cargo saved were in great danger of total loss. Captain Pond of the "Iroquois", said in reference to the position and danger of the tug "Fearless" while hauling at the "Dunreggan", "that it was not a place where he would ordinarily care to take his vessel, unless in a case of absolute necessity"; yet the "Fearless" was fortunate enough to avoid any untoward accident in her efforts to rescue the stranded vessel. The officers and men of the "Fearless" did their full duty in the premises, and while there were no peculiarly hazardous circumstances connected with what they did, and especially in view of the fact that no lives were lost or serious injury suffered, yet it is not debatable but what there was some risk and more or less bravery displayed by the officers and men of the "Fearless" in remaining all of the night of the 8th of August in shallow waters on the edge of the coral reef (the cause of the disaster of the "Dunreggan") within a hundred yards of the breakers, subject to strong currents, hauling and pulling at the "Dunreggan" in the darkness of the night in order to keep her head to the sea and to the wind. That this largely prevented the stranded vessel from going broadside upon the reef and thus becoming a total wreck, is borne out by the testimony of a majority of the witnesses, and was admitted on the argument by the proctors for libellee.

As to the dangerous position in which the "Dunreggan" lay when she was pulled off the reef by the combined efforts of the three salving vessels, the "Iroquois", the "Eleu" and the "Fearless", there can be no question. The report of the surveyors, Messrs. Williamson, Davis and Campbell, sent out by the Agent of the Lloyd's in Honolulu, introduced in evidence as Libellee's Exhibit H., and made after an inspection on the 8th of August, soon after the ship went upon the reef, states that they "found the ship's draft when she went on the reef was 9 feet 8 inches. * * * we found the ship making water at the rate of 4 inches per hour and had 21 inches of water in the wells.

"The port pump was not in working order, owing to the loosening of the cement in the bottom. Found the ship bumping very

heavily and lifting the mainmast up several inches; the rudder working up through the deck about 8 inches according to the swell."

Some point is made to the effect that the ship was on soft coral, but whatever the character of the rock upon which the ship rested, the evidence is that she was gradually bumping herself to pieces; the water for some distance around the ship was colored with the broken pieces of coral ground fine by the ship's action upon it; she was leaking badly and as appears from the testimony of the diver Young, who examined her bottom after she was taken into the port of Honolulu, and who testified upon the hearing before the Referee "eight of her frames were injured and bent entirely away from the plates, about four frames off from the keel up......the bottom of the ship was bent in ......and those frames are bent sidewise......the keel forward is bent slightly to the port side......the rivets in the plates were all spit out and the rudder was injured."

That the vessel was seriously damaged by her perilous experience and unable to go to sea with a cargo without necessary and extensive repairs seems to be admitted. As to the actual amount necessary to be paid in order to put the vessel into seagoing condition, and which cannot be well done in Honolulu owing to the lack of mechanical appliances and conveniences for so doing, there is some difference of opinion among the witnesses for libellant and libellee, the estimated amounts varying from $15,000 to $35,000 for temporary repairs at Honolulu and expenses, and permanent repairs elsewhere; and which in the opinion of the Court will not exceed, and for the purposes of determining the amount of salvaged property is hereby held to be, $5,000 for temporary repairs and expenses and $20,000 for permanent repairs to the ship.

To the unprejudiced mind, the unanimity of the evidence as to the fact of the injuries sustained by the vessel and the cost of repairs, (although varying in amounts,) is sufficient to settle the proposition of the dangerous position of the "Dunreggan" when she was rescued.

There is some testimony upon the subject of what might have been done, but the Court will not consider seriously any hypothetical means for saving the vessel after she had been rescued by the salvors and after the dangers were passed.

It may be and doubtless is true that in the hurry and excitement of a wreckage like this, the very best thing is not done and possibly the very best thing was not done in this case, but enough was done to save the ship although damaged seriously by her rough experience and to save also a cargo worth with the freight $54,266.59. It now ill becomes the Captain or other officers of the "Dunreggan" to say that this could have been done by other means, but which means were not employed. No subsequent opinions of the officers of a wrecked vessel looking backward as to what they might possibly have done but which they did not do can in anywise disparage or undervalue what was done by the salvors. The *Alaska* and her cargo, 23 Fed. Rep. 597-608; the *T. F. Oaks*, 87 Fed. Rep. 229-232; The *Winifred*, 102 Fed. 988-990.

It appears from the evidence that the "Eleu" rendered services on the afternoon of the 8th of August covering a period of some four or five hours, but that when her spring broke, she slipped her hawser and left the "Dunreggan" with the "Fearless" still unremittingly towing at the vessel where she had been constantly from 11 a. m. of that day. That the "Fearless" contained to work without cessation in her efforts to release the vessel and without any interruption (save for three quarters of an hour when she broke her hawser) for the period of thirty-two hours, when the vessel finally came off the reef.

The "Eleu" did not return to the scene of the disaster until an hour before the vessel came off the reef on the afternoon of the 9th, and within forty-five minutes after the "Eleu" had joined her efforts to those of the "Fearless" and the "Iroquois." The "Iroquois" had been tugging hard at the vessel on the 9th in conjunction with the "Fearless" from about 2 p. m. until 4:10 p. m. when the vessel was floated. The "Iroquois" was the most powerful of the three salving vessels, having a horse power of

about 1,100; the "Fearless" next with 812 horse power, and the little "Eleu" with a horse power of from 350 to 400, as appears in testimony. The steady strain exerted by the "Fearless" during the 32 hours she had worked with the vessel had not effected her release, nor had the dual pulling of the "Iroquois" and the "Fearless" together, during the last two hours before she came off the reef; and while it is claimed by both Captain Brokaw of the "Fearless" and Pond of the "Iroquois", (and which appears to be borne out by the photograph of the three vessels showing their relative positions to the "Dunreggan" and to each other, introduced in evidence marked Libellant's Exhibit 4,) that the "Eleu" was pulling in antagonism to the "Fearless" and the "Iroquois", yet there is testimony tending to show that the "Eleu" was carried away by the wind and currents and when signalled to, she swung around in line with the other vessels and pulled her best.

In any event, considering the relative power of the three vessels, it is doubtful to say the least that the "Eleu" was the moving factor or accomplished much in the withdrawing of the "Dunreggan" from the reef, considering that the combined efforts of the "Iroquois" and the "Fearless," two powerful vessels, had up to that time failed to move the vessel. Yet within 45 minutes after the "Eleu" had joined her efforts to those of the other two, the ship came off the reef. It may be that the "Dunreggan" was on the point of yielding or possibly a favoring swell or higher water caused by the tide was the reason, but it may be also that the "Eleu's" strength was the last modicum of force needed to cause the final withdrawal of the ship from her perilous position.

It is settled in the mind of the Court that in considering the amount of salvage to be awarded, the "Fearless" is first. The "Iroquois" having asked no salvage, however efficient the Court may consider her services, it cannot decree remuneration therefor; the "Eleu" having been paid in full for the services rendered by her as per the receipted bill introduced in evidence, she is entitled to no further compensation. There yet remains the

claim of Captain Macauley, the intervenor, for personal services rendered by him for about an hour on the afternoon of the ninth. It seems that he was an experienced pilot, familiar with the depth of the water and the currents where the vessel was wrecked, and while counsel for libellee claims that he is debarred from demanding any salvage by reason of the "Eleu" having been paid in full for her services, upon an agreement made with Captain Hilibus on the 8th of August, and assented to, as claimed by the Master of the "Dunreggan" by Captain Macauley when he arrived on the scene on the 9th, yet it is not clear to the Court from the testimony that Macauley and Dixon understood each other or that there was any meeting of minds between them on that day in the nature of an agreement. The Court is inclined to believe that Captain Macauley was a volunteer, when his services were accepted by the Captain of the "Dunreggan", and that he simply responded, "yes", to the inquiry of the Captain of the "Dunreggan" when he asked if it was the same boat that he (Dixon) had made the agreement with the day before, without any confirmation of said agreement. And while it is true the "Eleu" was paid for that day also, the Court is inclined to the belief that Macauley is entitled to some compensation for the services rendered by him personally as master, notwithstanding the settlement of the "Eleu." *Robertson v. Wellington*, 52 Fed. Rep. 605; *The Wellington*, 54 Fed. Rep. 901.

In the arguments oral and written submitted by the respective counsel, the chief point made by them was to show on the one hand, the reasons why the award of salvage in this case should be large; and on the other hand why it should not be; it being admitted that the "Dunreggan" was in danger and that the "Fearless" performed salvage services in rescuing her. But counsel for libellees claims that such services were not entitled to much reward. To sustain that position he says there was no danger to life on either the ship "Dunreggan" or the tug "Fearless." To be exact, he claimed there was "not the slightest danger to life." He argued that this was so because the weather was fair and continued fair during the period the "Dunreggan" was on

the reef, and that she was pulled off the reef before she was wrecked. Assuming it to be true that there were no lives imperilled, yet the Court cannot see why reasonable salvage should not be allowed for meritorious effort to save the ship and cargo. There were some twenty-four men on board of the "Dunreggan." While the ship was safe, they too were safe. But if a storm had arisen, all the testimony bears out the presumption that the ship would have been pressed back upon the reef and become a total wreck, and the lives of those on board would have been in peril. And if in peril would not these seamen naturally have sought for the assistance of the officers and men of the tug "Fearless" who were near them on the sea during the day and night of the 8th of August; and they were there to aid them. There can be no question that if the ship had become an hopeless wreck the men on her would have been wrecked also. Looking back upon their good fortune in being rescued, and because no heavy sea rolled in upon them to send them into the breakers, affords but a slight argument that their lives were not in danger. Nor was it necessary to entitle these libellants to fair and reasonable salvage that some one should lose his life or be in imminent peril of losing his life. If the salvors persistently did all they could do to save the ship and at the same time avoid the danger which a loss of the ship would cause to the men on board, they are entitled to fair and liberal compensation in the event of success. The Court thinks the salvors did this. No ship is safe stranded on such a reef as was the "Dunreggan," and when she was saved from danger the men on board were saved from danger. No one doubts but if the ship had been cast broadside on this reef she would have broken to pieces, and it is in evidence that she was in hourly danger of swinging around broadside to the sea on the reef. Every wave that rolled by, pounded her harder on the reef and every blow she struck on the bed of rock on which she rested weakened her. Her steel frames were being twisted out of shape, her steel plates were pulling apart, her rudder was injured, her pumps were fast becoming useless. Indeed she was already a wreck, for

more than one-third of her value had been pounded out of her. In that situation was it not a matter of congratulation for all the men on board of her during the night of the 8th of August, to know that in the open sea in front of the "Dunreggan" lay the "Fearless" pulling to keep her head to the wind and to prevent any further disaster to her? The captain and the other officers of the "Fearless" were all night awake and watchful. In the opinion of the Court it is for such services as these and for the encouragement of such services, that salvage is allowed. The ship was saved and most of her cargo was saved and all the lives on board of her were saved; and while for the saving of life there is no salvage, yet the "Fearless" was there to save life as well as property.

While it is true that every case of salvage must in a sense stand on its own merits, yet Courts are controlled largely by precedent, and if this Court is to consider standing decisions as to the amount of salvage allowed, it cannot but be influenced in determining the amount of salvage by the fact that between 1797 and the year 1896, there were over forty cases decided by the Federal Courts of the United States where the amount of salvage allowed was fifty per cent. and over of the value of the property saved; and between 1792 and 1892 there were thirty-nine salvage cases decided by the Federal Courts of the United States where the amount of salvage decreed to the salvors was under fifty per cent., but in excess of twenty-five per cent. of the property saved; and between the years 1816 and 1896 there were forty-three cases decided by the same Courts where twenty-five per cent. and under of the property saved was allowed to the salvors. (Note to the *Lamington*, 86 Fed. 675; 695-6,) where the Court says in reference to the cases cited, "enough cases are hereinbelow given to show the prevailing rates; the list is reasonably exhaustive."

As was said in the case of *The Kimberley*, 40 Fed. 289, 300-1, "On the subject of proportions, the cases show generally that the old rule of allowing to the salvors arbitrarily, in every case, half the values saved no longer obtains. Indeed that rule

came at last to so revolt the Courts of admiralty that in their repugnance to it they went far towards the other extreme, and manifested a temper to discard the idea of proportions and to confine themselves too much in their awards to the *quantum meruit* estimate of salvage services. There has latterly however, been a recurrence, except in cases of towage, from extreme views in that direction to the middle ground of adapting the amount allowed to the circumstances of each case; giving always the *quantum meruit* and giving also when the case calls for generous treatment, a liberal bounty proportioned to the value of the property saved, taking into consideration, also, the value of the property lost; giving a larger proportion where all the property is saved, and a smaller one where more or less of it is lost."

See also *The Penobscot*, 103 Fed. Rep. 205.

It has been held that "in general the rate of salvage ought not to be less than one-third, unless the property be very valuable or the service very inconsiderable." *Desty on Shipping and Admiralty*, Sec. 320, and cases there cited.

After a careful reading of the testimony taken in this case and of the briefs of the various counsel, the Court is of opinion that the value of the "Dunreggan" when she went upon the reef was $65,000; that the amount of money necessary to repair her will be $25,000, leaving her present value $40,000. It is conceded that the value of the cargo and freight saved is $54,-366.59, making a total valuation of the property saved $94,-266.59.

Considering all the circumstances of the case, without reference to the question of proportions, the Court is of opinion that a reasonable compensation to the salvors in view of the amount of property rescued should be the sum of $12,000, to include the services of all three vessels. That of this amount the "Iroquois" would have been entitled to $3000 if she had made any claim for salvage; not having done so that amount inures

3—U. S. D.

to the ship "Dunreggan" and her cargo; that the "Eleu" has been already paid and receipted in full for her services amounting to the sum of $157.70, also to be deducted from said sum of $12,000. Captain Macauley is entitled to some compensation for the services rendered by him and the Court hereby awards him the sum of $500. That the balance of said $12,000 after deducting the said $3000 and the sum of $157.70 already paid by the "Dunreggan;" and after the payment to Captain Macauley of said $500 as aforesaid, to-wit: $8,342.30 is ordered distributed as follows: $1300 thereof to the master and crew of the tug "Fearless" in the following manner: To Captain G. H. Brokaw, $600; to Richard B. Seike, the mate of the "Fearless," $200; to Bert Wheeler, the chief engineer, $150; to J. S. Purdie, the assistant engineer, $100; to Dave Rees and C. Torkelsen, deck-hands, each $50; to William Parker and J. Hancock, firemen, each $50; to John Johnson, the cook, $35; and to J. Wiese, the mess boy, $15, constituting the master and crew of the "Fearless;" the balance of $7042.30 to go to J. D. Spreckels Brothers & Co., the libellant herein, as owner of the tug "Fearless" in full for the services of the tug and including all expenses incurred by the tug "Fearless" in the rescuing of the "Dunreggan."

Let judgment be entered accordingly.