## Case No. 17,056.

### The WALDO.

[2 Ware (Dav. 161) 165; 1 4 Law Rep. 382.]

District Court, D. Maine. Dec. Term, 1841.

SHIPPING—LOSS OR DAMAGE TO CARGO—STOWAGE ON DECK— AUTHORITY OF MASTER—CONSIGNMENT TO MASTER FOR SALE.

1. The master of a vessel is bound to secure the cargo under deck. If he carries goods on deck they are at his own risk, and if they are lost or damaged he cannot protect himself under the usual exception of the dangers of the seas, at least, unless the accident by which they are lost would have been equally fatal if they had been under deck.
[Cited in The Wellington, Case No. 17,384; Chubb v. 7,000 Bushels of Oats, Id. 2,709; The Delaware, 14 Wall. (81 U. S.) 605.]

2. A shipper, whose goods are lost or damaged by the fault or neglect of the master, has for his damages a remedy against the owners, and a lien on the ship.
[Cited in The Hendrik Hudson, Case No. 6,358; Dupont v. Vance, 19 How. (60 U. S.) 169.]

3. But it is only those acts of the master which are within the scope of his duty as master, that bind the owners and create a lien on the vessel.
[Cited in The Illinois, Case No. 7,005.]
[Cited in Thompson v. Hermann, 47 Wis. 610, 3 N. W. 583.]

4. If the shipper consign his goods to the master for sale, the master, in all that relates to the safe stowage and transportation of the goods, acts in his quality as master. He is the agent of the owners, and his acts bind the owners of the ship.
[Cited in The Flash, Case No. 4,857.]

5. But in what relates to the sale and disposition of the goods, after they are carried to the port of destination, he acts as agent of the ship-

1 [Reported by Edward H. Daveis, Esq.]

per, and neither the owners nor the ship are responsible.

[Cited in The New Hampshire, 21 Fed. 927; The Maiden City, 33 Fed. 717.]

This was a libel in rem, brought for the non-performance of a contract entered into with the master by a bill of lading. The libellant shipped at Bath, on board the schooner Waldo, bound for Atakapas in Louisiana, 144 barrels of potatoes, to be delivered at that port, at the freight of fifty cents a barrel, and consigned to T. H. Merrill, the master, who signed the bill of lading. It is in the common form and is dated Nov. 23, 1840. The potatoes were stowed on deck and well secured there and covered with boards. About the time they were laden, the master was taken sick and unable to go the voyage, and after the vessel was prepared for sea, she was delayed some days before another master was engaged. She sailed December 2d, under the command of W. C. Wyman, the new master. A few days after leaving port they met with heavy gales. The sea run high and broke over the vessel and wet everything that was exposed to the water on deck. When about ten days out, the weather having become more moderate, the potatoes were partially overhauled and found to be wet and many of them rotten. On their arrival at Key West, there was a more thorough examination; the rotten potatoes were separated from the sound and thrown away, and forty barrels of sound ones were repacked. With these, and forty barrels more, which had not been examined, they sailed for Atakapas. When they arrived there, it was found that all the potatoes were rotten and spoiled, except fifteen barrels, which were sold at two dollars a barrel, and pay taken in molasses. On the return of the vessel, no account of sales was rendered to the shippers, and this libel was brought against the vessel for the non-performance of the contract.

Sewall & Howard, for libellant.

Mr. Groton, for respondents.

WARE, District Judge. In a contract, by a bill of lading, for the transportation of merchandise, the master and owners of a vessel take upon themselves the responsibilities of common carriers. They can excuse themselves for the non-delivery of the goods, only by showing that it was prevented by some fatal accident, against which human prudence could not provide, by an act of the public enemy, or by some event expressly excepted in the instrument itself. 3 Kent. Comm. 216. The master is bound to take the greatest care of the goods, so that they shall not be liable to injury by the motion or leakage of the vessel, or exposed to damage by the weather. Abb. Shipp. 224. In respect both to the lading and carriage of the goods, he is chargeable with the most exact diligence. In all cases he is bound to have the cargo safely secured under deck, unless he is authorized by some local or particular usage, or by the consent of the shipper, to do otherwise. In all other cases, if he carries the goods on deck, he does it at his own risk, and he becomes an insurer against the usual perils excepted by the bill of lading.

If the goods of the shipper are lost, or receive any damage through the fault or neglect of the master or of the crew, his remedy is not confined to a personal action against the master or owners. The ship in specie stands as his security, and is by the maritime law hypothecated to him for his indemnity. But then it is not every wrongful act of the person who acts as master that will bind the owners, or will operate an hypothecation of the ship. It is only those which fall within the legitimate range of his authority, as master, that have this effect. While acting within these limits he binds the owners, because he is their authorized agent, and he binds the ship directly, because the policy of the maritime law has given to the shipper this additional security. The duties of the master as carrier extend to all that relates to the lading, transportation, and delivery of the goods. But when they are carried to the place of destination and delivered, his duties and responsibilities as carrier terminate. His functions as master are then accomplished.

If the shipper consigns his goods to the master for sale and returns, in proceeding to dispose of them he does not act under any authority derived from his appointment as master, but in an entirely new character, that of supercargo or factor. And his duties and liabilities under these two characters are as distinct and independent as they would be if the trusts were confided to different persons. Story, Ag. § 36; 2 Liverm. Prin. & Ag. p. 215. In all that relates to the transportation of the goods and navigation of the ship, he acts as master, and all that he does in relation to the disposition of the merchandise, is referred to his character as factor. In these characters he is the agent of different principals; in the first he is the agent of the ship-owners, and his acts are imputable to them; in the second he is a stranger to them, and they are no more responsible for his acts than they would be for those of a third person, to whom the shipper should consign his goods. In the transaction of that business, he is the agent of the shipper.

In the present case the goods of the libellants were consigned to the master, Capt. Merrill. It is true that he was prevented from going the voyage by sickness; but that portion of the potatoes, which arrived at the port of destination in good condition, were sold by the new master, not by virtue of his general authority as master of the vessel, but under the authority of that consignment. In the sale, therefore, he acted as the agent of the libellants and not of the ship-owners. It is clear, then, upon principle, that the owners cannot be chargeable for so many of the potatoes as were sold. With respect to them, all was done which the master had contracted to do, as master. They were carried to the

port of destination and delivered; that is, the master had transported them as the agent of the ship-owners, and he had sold them as the agent of the shippers. The precise question which arises in this part of the case, was presented in the case of Williams v. Nichols, 13 Wend. 58, and it was decided, on the grounds that have been stated, that when goods are consigned to the master for sale, and he sells them, and neglects to account for the proceeds, no action will lie against the ship-owners. It is an affair exclusively between the shipper and the master, to which they are strangers.

If no action will lie against the owners in personam, for an equally good reason none will lie in rem against the vessel. It is only those acts of the master which come within the scope of his duty as master, that bind the vessel. When a new character is superinduced on that of master, by his being made by the shippers the consignee of the cargo, his responsibilities in this capacity are entirely distinct from his obligations as master. In the latter case he is a common carrier, in the former a factor. And for any want of fidelity in that trust, his employers have the same remedies against him that they would have against any other person, and no other. As consignee he neither represents the vessel nor its owners. Perhaps when by a known custom of a particular trade the master is intrusted with the disposal of the cargo, a different rule may apply. This was the case in Kemp v. Coughtry, 11 Johns. 107. That arose in the trade between New York and Albany. It was proved to be the usual course of the trade, to send goods with orders to the master to sell either for cash or credit, and for him to return the proceeds to the shipper. No commissions were allowed the master for this service, nor to the owners, beyond what was involved in the freight. It was decided when the master had sold the goods, and failed to pay over the proceeds to the shipper, that the owners of the vessel were liable. The liability, in that case, was not founded on the general maritime law, but arose out of the particular custom. Under that custom the ship-owners undertook to act in the character of factors, as well as carriers, and intrusting the whole business to the master as their servant, they would be answerable for him personally in one character or the other. It is another question, whether for his defaults in the character of factor the shippers would have a remedy against the vessel in rem, which it is unnecessary to consider in the present case, as in this trade no such custom is proved. The case of Emery v. Hersey, 4 Greenl. 407, turned upon the same principles, and was decided upon the ground of a similar custom prevailing in the trade between Saco and Newburyport. See, also, Emerigon, Contrats à la Grosse, c. 4, § 11, and Des Assurances, c. 12, § 3.

As to that portion of the potatoes which perished on the passage, the evidence leaves no room for doubt that the loss arose from the damage they received by exposure on deck. They appear to have been as faithfully secured in that place as they could be, but nothing could protect them from wet, when the sea was breaking over the vessel. It appears probable, also, that they were injured by the frost. The double injury, of frost and wet, will in a short time destroy so perishable an article as the potatoe. And it was accordingly found, when they were overhauled at Key West, that out of 144 barrels examined, only 40 remained sound and fit for use; and when they arrived at Atakapas there were but 15 sound and merchantable barrels left out of the whole 144. They were undoubtedly lost by sea damage, and although the damages of the seas are excepted by the bill of lading, the master, by carrying the goods on deck, waives the exemption in his favor, and takes the responsibilities of sea damage upon himself; at lease, of any damage that would not have happened to them if they had been secured under deck. It was the right of the shipper to have his goods stowed under deck, and it was the fault of the master that they were placed above. And it is a general rule, that a party will render himself liable for loss or damage, to which he would not usually be subject, by the law of the contract when this loss has been preceded by some fault on his part, without which it would not have happened. 6 Toullier, Droit Civil, No. 227; Poth. Des Obligations, No. 142. Upon general principles, therefore, there is no room for questioning the liability of the master, and through him that of the vessel, for the potatoes that were lost, unless the respondent can bring the case within some especial exception to the general rule.

The defense set up in this case claims the benefit of such an exemption. It is contended that the goods were carried on deck with the consent of the shippers. This does not appear by the bill of lading. That is what is called a clean bill; that is, it is silent as to the mode of stowing the goods, and contains no exceptions to the master's liability, but the usual one of the dangers of the seas. The usual, and only safe mode of carrying goods, is under deck, and when the contract is entered into, it is presumed to be the intention of the parties, that the goods shall be stowed and carried in the usual way, unless there is a special agreement to the contrary. This is a condition that is silently understood by the parties, and implied by the law. A bill of lading therefore imports, unless the contrary appears on its face, that the goods are to be safely secured under deck. The written contract, therefore, not only fails to show any such consent, but impliedly negatives it. 3 Kent, Comm. 206; Vernard v. Hudson [Case No. 16,921]; Curt. Merch. Seam. 212.

The respondents then proposed to prove this consent by parol evidence. The general rule is, that parol evidence cannot be received to contradict, vary or control, the ef-

fect of a written instrument. It is true that the bill of lading does not say, in express terms, that the goods shall be stowed under deck. But this is a condition tacitly annexed to the contract by operation of law; and it is equally binding on the master, and the shipper is equally entitled to its benefit, as though it was stated in express terms. The parol evidence is offered, then, to control the legal operation of the bill of lading, and it is as inadmissible as though it were to contradict its words.

But, admitting this rule of evidence, it is contended that the bill of lading was executed under such circumstances that it is not legally binding upon the master, as a written contract. The testimony is, that when he signed it, he was confined to his bed by sickness, and was so feeble as to be unable to sit up, but was supported by others while he wrote his name; and that he had been delirious before, and was after it was signed. The papers were brought to his house, filled up, and ready for his signature. His friends objected to his being called upon to execute them, on account of his sickness, but when he was informed that the shippers were in the house, and of the purpose for which they had come, he said it was proper that the papers should be signed by him, and they were accordingly brought to him and signed. It is not pretended that he was in a state of mental alienation at that time. On the contrary, his physician, who was present, states that he was in the possession of his faculties, and that he perfectly understood the nature of the business he was doing. The agreement had been made with the shippers before he was taken sick, and he had himself directed the manner in which the goods should be stowed. It appears, that at the time when he executed the papers, he recollected and understood what had been done.

Although, upon the whole evidence, it does not appear that the master was laboring under such a degree of mental debility as to be legally incompetent to an act of this kind, yet it is true that he was in a state of extreme weakness, with the powers of his mind probably enfeebled by disease. And if there was anything in the evidence, which looked like a design, on the part of the shippers, to take advantage of his condition, and draw him into different engagements from what had been understood and intended, I have no question but it would be the right of the court, and I think its duty, to look into the matter with great care. A court of admiralty is not, in such cases, governed by the narrow doctrines of the common law, which will not allow a man to plead his own disability, or, in the ungracious language of that law, to stultify himself. Co. Litt. 247a, 247b; 2 Bl. Comm. 291; 1 Story, Eq. Jur. § 225. But the only circumstance that has the slightest tendency to awaken such a suspicion is, that the shippers brought the bill of lading ready filled up, and this alone, when the state of the master's health is considered, would be a very narrow foundation for supporting a charge of fraud. But still, under the circumstances of the case, the court may have a right to look into the evidence, as it will probably be most satisfactory to the parties that it should. It seems hardly proper for a court, which is, by the constitution, required to decide between parties ex æquo et bono upon the most liberal principles of equity, to close its ears against evidence on technical objections, if it be doubtful whether the objection be fairly applicable to the facts; and being less restrained in its course of proceedings by technical and arbitrary rules, it is perhaps its habit to be less rigorous in upholding such objections.

I have, therefore, looked into the whole evidence to see if there is any satisfactory ground of belief, that there was any agreement or understanding between the parties that the goods should be carried on deck. In the first place, it is to be observed that the presumption in every contract of affreightment is, that the goods shall be secured under deck. It is for the master who would exempt himself from the risks of a deck passage, to remove that presumption. The ordinary and proper evidence would be a memorandum to that effect on the face of the bill of lading. But in the present case the only evidence, which has any tendency to prove the fact, is the testimony of the mate and one of the crew. The mate says that the libellants were on board the vessel on the 23d of November, after the goods were laden; that they were then on deck, carefully covered with two thicknesses of boards on the top and at the sides, and as well secured from the weather as they could be in that situation, and that the libellants expressed themselves satisfied with the manner in which they were secured. On a further examination he said that he did not understand them as expressing themselves satisfied with the fact that the potatoes were on deck, but only that he had done his duty in securing them well in that place. The other witness said merely that they knew that the potatoes were on deck, and made no objection to it. It appears also, that when the bill of lading was executed, no complaint was made to the master on this subject. If this evidence stood alone, it might justify the inference that the shippers assented to their goods going on deck, and in that case the risk of a deck passage would be shifted from the master to them. But although there is no testimony directly contradicting it, there is evidence leading to an opposite conclusion. The contract of affreightment was made several days before the goods were actually received and laden, and the price of the freight settled. The potatoes were taken by the master in his boats at Bath, and carried to Phippsburg,

where the vessel lay, several miles from the residence of the shippers. When they went to get their bill of lading, the vessel was completely loaded and ready for sea, and it was evident that the goods must go as they were, or not go at all. Now there is no evidence that when the agreement was made anything was said of the goods being carried on deck, or that any thing was said between the master and shippers at any subsequent time. The bill of lading was executed in pursuance of this previous agreement, and no objection to it was made by the master. And if it be said that the state of the master's health will account for his not giving particular attention to the form of the bill of lading, it will equally account for the shippers not making the lading on deck a matter of discussion at that time. Now it is very material to be remarked that the full under deck freight was agreed to be paid, and was secured by the bill of lading. Certainly. it is not easily to be believed, that any prudent merchant would consent to take upon himself all the risks of a deck passage, after agreeing to pay full freight. The most, then. that can be said of the parol evidence is, that part of it leads to the inference that the shippers may have consented that their goods should go on deck, and another part, of quite as much stringency, leads to an opposite conclusion. Indeed, it seems to me that it would be putting the case quite as favorably to the master as the facts would warrant, if it stood on this testimony alone, to say that it was a balanced case. And then the common presumption which arises in the absence of any special agreement, that the goods are to be secured and carried in the usual manner. turns the scale in favor of the shipper; because this presumption must prevail until it is removed by the master.

There can be no doubt from the evidence. that the potatoes were destroyed by being wet by the sea breaking over the deck of the vessel, and in part probably by being touched by frost. The bill of lading contains the usual exceptions of the master's liability for the dangers of the seas. But, as has been already observed, this will not excuse him if he carries the goods on deck, unless the calamity by which they are lost would have been equally fatal, if they had been properly secured below deck. But if this had been done it is plain that they would have gone safely, as was the case with the rest of the cargo. Some evidence was introduced to show that potatoes are as liable to rot under as above deck. That may be the case if the vessel has uniformly moderate and dry weather, but it cannot be if they are exposed as these were to wet and frost. It is to secure goods from such dangers, as well as for other reasons, that the master is required to have the cargo put under deck. If after filling the hold he chooses to encumber his deck with goods, in order to increase the

amount of his freight, he voluntarily assumes the responsibility upon himself. The additional expected profits of the voyage constitute the premium for the risk of the deck load.

The damage which the libellants have sustained is the value of the potatoes which were lost, at the port of delivery, deducting the freight. The testimony of the mate is, that the potatoes which arrived sound were sold for two dollars a barrel; and 129 barrels. the amount that perished on the voyage, after deducting 50 cents for freight, will amount to $193.50; for which sum a decree is to be entered for the libellants.

[For a libel in personam founded on a bill of lading against the master and owners of the Waldo, and arising out of the same voyage as the above libel, see Case No. 13.460.]