## THE PELOTAS.

Petition of COMPANHIA DE NAVEGACAO LLOYD BRASILEIRO.

No. 17429.

District Court, E. D. Louisiana.
Sept. 30, 1930.

the Pelotas in rem. Monition was issued and served on the Lloyd Brasileiro in the in personam action and the Pelotas was seized in the in rem action. Before appearances or answers were filed in these proceedings, the Lloyd Brasileiro filed in this court the petition for exoneration from or limitation of liability now under consideration; and all proceedings, except in this cause, including libels filed by the coffee owners and salvors against the Lloyd Brasileiro in the Eastern District of New York were stayed by the process of this court.

The petition alleges that in August, 1923, the Pelotas sailed from the Brazilian ports of Santos, Rio de Janeiro, and Victoria laden with cargo for La Guaira, Vera Cruz, and New Orleans. That in due time she arrived at La Guaira, discharged cargo intended for this port, and proceeded thence directly for Vera Cruz. The petition then sets forth various alleged occurrences of the voyage bearing principally on the navigation of the vessel, and states that shortly after 11:05 p. m. on the evening of September 15th, while proceeding to anchorage off Vera Cruz, the vessel stranded forward on the shoals of Galleguilla Reef. The efforts made to float the vessel are set forth in detail; the discharge of coffee into lighters furnished by the Mexican navy is described, and it is alleged that on September 22d, two days after the lightering commenced, a representative from the Huasteca Petroleum Company came aboard the vessel to enter into an agreement with the master to salvage the vessel and her cargo, and it was agreed that his company proceed with the salvage work on a basis of "no cure, no pay." The salvage operations and the assistance rendered by the crew and the occurrences during the various watches are set forth in minute detail. The discharge of sound coffee into lighters and the jettisoning of totally damaged coffee is described, and it is alleged that on October 6th, at 8:45 p. m., the Pelotas was floated with the aid of salvage tugs and thereupon proceeded into port under her own steam. The sorting, shifting, bagging, and jettisoning of coffee, the activities of the salvors and of the crew during the next fifteen days is described. It is then alleged that a survey of the vessel was had by a board of surveyors who reported the ship seaworthy to make the voyage, though not in a fit condition to carry sound cargo; hence, she left her cargo in Vera Cruz and proceeded on to New Orleans, assisted by the salvage tug Warbler, arriving at destination on Octo-

John D., M. A., & Edwin H. Grace, of New Orleans, La., for petitioner.

Bigham, Englar, Jones & Houston, of New York City, Dart & Dart, of New Orleans, La., D. Roger Englar and Henry N. Longley, both of New York City, and Henry P. Dart, Jr., of New Orleans, La., for cargo claimants and intervener.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City, Terriberry, Young, Rault & Carroll, of New Orleans, La., P. F. Shortridge, of New York City, and Joseph M. Rault, of New Orleans, La., for salvors.

BORAH, District Judge.

This is a petition filed by the Companhia de Navegacao Lloyd Brasileiro, hereinafter called Lloyd Brasileiro, owner of the steamship Pelotas, for exoneration from or limitation of liability.

Prior to the filing of this petition, libels were filed in this court by David G. Evans Coffee Company et al., the owners of the coffee shipped on the Pelotas, against the Lloyd Brasileiro in personam and against

ber 27, 1923. Following this allegation the petition sets forth that all of the coffee jettisoned from the Pelotas at Vera Cruz was first condemned by A. Lee, the representative of underwriters on said cargo; and that it was agreed between the master of the Pelotas and the underwriters that the cargo should be brought forward to New Orleans by the steamship Jalisco at 39 cents per sack or package, and that this expense should be treated as a general average disbursement. Continuing on, the petition alleges that the loss, damage, injury, and destruction to the coffee "were occasioned, done and incurred without fault or privity of your petitioner, or without knowledge on petitioner's part, of any kind, contributing to said loss, damage, injury or destruction, and without fault of any of its officers, agents or servants, but were due solely to perils of the sea." Petitioner then expresses its desire "to contest its liability for the loss, destruction, damage and injury occasioned by said accidents, and growing out of said salvage services, and also to claim the benefit of the limitation of liability provided in the third and fourth sections of the Act of Congress entitled 'An act to limit the liability of ship owners, and for other purposes,' passed March 3, 1851, now embodied in sections 4283 and 4285 of the Revised Statutes of the United States." It is next alleged that petitioner is entitled to exoneration from liability by reason of the fact "that said steamship Pelotas was in all respects sound, staunch, and seaworthy, and properly manned and equipped, and provided for the voyage in which she was engaged, and under command of proper and suitable officers. That said accident occurred through no fault or negligence on the part of the persons on board of or having charge of the navigation of the said steamship, but was solely due to the perils of the seas." Reference is then made to the suits filed in this court by the cargo owners against the Pelotas in rem and the petitioner in personam; the suits filed in the Eastern District of New York by the Huasteca Petroleum Company and Merritt-Chapman & Scott Corporation, as salvors of the ship and cargo; and the petitioner prays for an appraisement to be had of the Pelotas and her pending freight or, at petitioner's election, for the appointment of a trustee to whom the said Pelotas and her tackle, apparel, etc., may be transferred and that this court issue its monition to "all persons claiming damages by reason of said stranding, jettisoning of cargo, assisting in salvage of ship and cargo, etc., as aforesaid, citing them to appear before the

said commissioner at or before a time to be fixed in said writ, and make due proof of their respective claims; and also commanding them to appear and answer all and singular the allegations aforesaid. * * *" The petition also prays for an injunction and, as has been said, upon the issuance of the monition and injunction, all the other litigation was stayed.

The cargo owners, thirty-eight in number, all filed claims in the limitation proceedings, as did the alleged salvors Huasteca Petroleum Company and Merritt-Chapman & Scott Corporation. The claims of thirty-six coffee importers were filed jointly, the amount of the claims of the respective claimants being set out, the total of that joint claim being in the sum of $705,240. The claim of the H. P. Coffee Company was filed in the sum of $110,000. The claim of the Brazilian Warrant Company was filed in the sum of $500,000.

The cargo claimants allege shipment of the coffee on the Pelotas in good order and condition, the agreement by the petitioner to carry the coffee on the Pelotas to New Orleans in accordance with the valid terms of the bills of lading issued by the petitioner, and then set out that the Pelotas, having this merchandise on board, sailed from the port of Victoria, the last port of loading for the port of New Orleans, "but, contrary to the terms of the bills of lading, the said vessel illegally and without justification, deviated from the direct, proper and customary course between the ports of Santos, Rio de Janeiro and Victoria and the port of New Orleans, and sailed to the port of La Guaira, Venezuela. After discharging cargo at La Guaira, the said vessel sailed across the Caribbean Sea and through the Yucatan Channel, but the vessel, instead of then pursuing a direct course to the port of New Orleans, again illegally and without justification deviated from the proper and customary course and sailed to the port of Vera Cruz, Mexico." The claimants also allege that "the said petitioner has not carried any of the said merchandise on the steamship Pelotas to the port of New Orleans as agreed in the bills of lading. A part of the merchandise has been delivered at the port of New Orleans, after trans-shipment at the port of Vera Cruz from the steamship 'Pelotas' to the steamship 'Jalisco'; but the merchandise so delivered was not in like good order and condition as when shipped, but was short, slack and seriously injured and damaged, and was subject to a lien for freight for

carriage on the steamship 'Jalisco,' not contracted for in the bills of lading covering the said cargo issued by the duly authorized agents of the said petitioner. The said claimants were obliged to pay, and did pay, to the duly authorized agent of the said steamship 'Jalisco,' a large amount of money to discharge the said lien for freight, and to secure the delivery of the said coffee. The said coffee was also subject to the lien of salvors who salved the said merchandise at the port of Vera Cruz, and the claimants have been obliged to give security in large amounts to procure the release of the said cargo from the said liens and to secure the delivery thereof. A large portion of the said merchandise has never been delivered by the said petitioner, either at the port of New Orleans or elsewhere, and the claimants have never received the same and the said merchandise has become totally lost. The loss of and damage to the cargo aforesaid, occurred while the cargo was on board the steamship 'Pelotas' and under the care and control of the petitioner, and after the illegal deviation above set forth."

The claims are in like form and in each instance set out that claimants are the owners and holders of the bills of lading covering the merchandise and are entitled to the delivery thereof. It is also alleged in the claims under the caption "The Grounds of Your Claimants' Claims: That the petitioner and the steamship 'Pelotas' wholly failed to deliver a part of the coffee hereinbefore mentioned, at New Orleans or elsewhere, and failed to deliver the remainder at New Orleans in the like good order and condition in which the same was received at the various ports of shipment in Brazil, in accordance with the contract of affreightment set forth in the bills of lading issued therefor. That prior to the occurrence of the loss and damage which forms the subject of these claims, the said steamship 'Pelotas' unlawfully and without justification deviated from the direct, proper and customary course of the voyage prescribed in the bills of lading issued for the said coffee."

Under the caption "The Items of Your Claimants' Claims" the name of claimants, the number of bags for loss and damage to which claim is filed, and the amount of the claims are set forth. By reason of the fact that all of the coffee delivered at New Orleans by the steamship Jalisco had not up to that time been sorted, apportioned, and reconditioned, leave was asked of the court to amend or modify the claims after complete

and final particulars of the loss and damage should be available.

The Huasteca Petroleum Company and Merritt-Chapman & Scott Corporation filed answers to the petition for limitation. As their answers and claims add nothing to the present issues, but bear only on the question of salvage, they will not be considered on this branch of the case.

The cargo claimants likewise filed answers to the petition for limitation. In their answers, which are similar in form, certain allegations of the petition are admitted to be true; the truth of other allegations is denied; and lack of knowledge or information sufficient to form a belief is alleged in relation to many of the allegations concerning occurrences during the course of the voyage of the Pelotas. The claimants specifically deny that the loss of and damage to the cargo was incurred without the fault, privity, or knowledge of the petitioner, and also specifically deny that the Pelotas was "in all respects sound, staunch and seaworthy, and properly manned and equipped, and provided for the voyage in which she was engaged, and under command of proper and suitable officers." Further answering, the claimants allege as an affirmative defense that the petitioner solicited cargo from the general public to be carried on the Pelotas from the ports of Santos, Rio de Janeiro, and Victoria, Brazil, to the port of New Orleans; that certain coffee exporters shipped 66,037 bags of coffee on the Pelotas for carriage to the port of New Orleans; that at the time of the said shipments the petitioner issued bills of lading to the shippers covering the carriage of said merchandise, a copy of the form of bill of lading employed being attached to the answers, together with a translation; that the claimants became the owners and holders of the bills of lading covering the coffee described in the respective claims and became entitled to the delivery of the said cargo in accordance with the provisions of the said bills of lading. It is also alleged that it was not customary either for the petitioner's vessels or for vessels of other lines maintaining a service between Santos, Rio de Janeiro, and Victoria and the port of New Orleans, to call either at the port of La Guaira or at the port of Vera Cruz, but that the Pelotas after taking on board her cargo at the ports of Santos, Rio de Janeiro, and Victoria, instead of pursuing a direct, proper, and customary course from Victoria, the last port of loading, to the port of New Orleans, wrongfully deviated from

her direct, proper, and customary course, put in at the port of La Guaira, and then after sailing therefrom, instead of pursuing a direct, proper, and customary course to New Orleans, after passing through the Yucatan Channel, the Pelotas again wrongfully deviated from her direct, proper, and customary course and sailed to the port of Vera Cruz. While the Pelotas was thus proceeding on this alleged wrongful deviation, the claimants' cargo sustained serious loss and damage.

Subsequently, the claimants amended their answers by adding the following three additional articles thereto:

"The said deviations to the ports of La Guaira, Venezuela, and Vera Cruz, Mexico, were ordered by the president and other duly authorized executive officers of the petitioner.

"Further answering the said petition, the claimants allege upon information and belief as follows:

"At the time that the said steamship 'Pelotas' sailed from the ports of Santos, Rio de Janeiro, and Victoria, she was unseaworthy for a voyage to La Guaira, Venezuela, Vera Cruz, Mexico, and New Orleans, in that none of her officers were familiar with the ports of La Guaira and Vera Cruz or the approaches thereto; in that she was not supplied with proper charts, pilot books and other navigating equipment, properly and safely to make the said voyage; in that the boilers, engines, condensers and other machinery of the said vessel were old and in an unseaworthy condition for such a voyage; in that the pumps and drainage system of the said vessel were old, worn and in an improper and unseaworthy condition; and in that the holes in the rose boxes on the suction pipes for the bilge pumps, were of such size as to permit coffee beans to be sucked into the pumps and render them unfit for use.

"The petitioner had privy with or knowledge of the unseaworthiness of the said vessel as herein set forth."

On September 24, 1925, the Thames & Mersey Insurance Company filed a petition of intervention in these proceedings under the provisions of the thirty-fourth rule in admiralty. The intervening petition sets forth the shipment of the coffee on the Pelotas by E. Johnstone & Co., Limited, at Santos and Victoria, the stranding of the vessel off Vera Cruz, and the loss and damage to the coffee shipped. It was then alleged that the intervener had insured the Brazilian Warrant Company, Inc., the consignee named in the bills of lading issued to E. Johnstone & Co., Limited, against all loss of and damage to the said coffee; that as a result of the insurance it was liable to pay and had paid to the Brazilian Warrant Company, Inc., a large sum of money for the loss of and damage to the said coffee, and that it had intervened in the proceedings to protect its rights in relation to the claims filed herein by the Brazilian Warrant Company, Inc.

After a delay of approximately five years reckoned from the time claims and answers were filed in the limitation proceedings, the petitioner filed answers to the claimants' claims. These answers are similar in form, and the language of one is common to the others, and they aid the present discussion to the extent that they clearly present facts bearing on the question of deviation and the privity and knowledge of petitioner's highest executives thereof.

In each of the petitioner's answers to the cargo claims there appears the following language:

"Petitioner denies that the steamship 'Pelotas' deviated from her scheduled voyage at the commencement of or during the course thereof or otherwise, or that said steamship 'Pelotas' did at any time or in any way deviate from the due course of her said schedule or itinerary and ports of call, which had been determined upon long before any business of said voyage was entered upon—even before the said vessel had left Rio de Janeiro, to proceed to Santos to enter upon this voyage, with her arranged itinerary and ports of call, which were scheduled to commence with the port of Santos, thence to Rio de Janeiro, thence to Victoria, thence to La Guaira, thence to Vera Cruz, thence to New Orleans, all in said order, where the said outbound voyage was thus scheduled to terminate. * * * "

The following also appears:

"The said Companhia de Navegacao Lloyd Brasileiro, petitioner herein, owner of said vessel * * * orally directed said master to proceed with said vessel from Rio de Janeiro advising him that on arrival at Santos said vessel would there take on passengers, cattle attendants, two hundred (200) head of cattle destined for Vera Cruz, various packages and sacks of cargo for other ports and therewith enter upon a voyage with her itinerary and ports of call to commence at Santos, and proceed thence to Rio de Janeiro, Victoria, La Guaira, Vera

Cruz, and New Orleans, there to receive orders for the return trip."

The said answers also allege as follows:

"Owners Sailing Direction to Master: After the steamship 'Pelotas' arrived at Rio de Janeiro, bound for Santos, Brazil, written instructions were then furnished her master respecting the prosecution of the voyage. Therein, and with respect to the ports of call she should make, on leaving Rio de Janeiro, should be Victoria, La Guaira, Vera Cruz and New Orleans. In fact, on leaving Rio de Janeiro she had on board articles of merchandise and goods for each one of said ports; among which was two hundred (200) head of cattle, cattle attendants, together with a passenger all for Vera Cruz, alone, taken on at Santos.

"These instructions, covering not alone the voyage she was on but related also to the care of passengers and others on board, care of ship, her cargo, etc., all for the guidance of said master, and for exhibition to any of the customs or other authorities of foreign countries to which she was bound, if necessary.

"The aforesaid document has been offered in evidence in this cause and is referred to for certainty in the premises."

From this outline of the pleadings it is apparent that the case as a whole presents only the two issues of deviation and unseaworthiness, and my appreciation of the record leads me to believe that of the two the predominant issue is deviation.

At the trial petitioner filed a peremptory exception based on the theory that claimants were proceeding on two inconsistent irreconcilable causes of action (deviation and unseaworthiness) and that they should be compelled to elect between them. Following the overruling of that exception, petitioner filed a special plea as a special defense to claimants' alleged causes of action, setting forth that by their method of stating their claims, as well as by their dealings with the cargo after the stranding, the claimants have barred themselves from insisting on the deviation. This special plea was likewise overruled. The petitioner now strenuously urges in brief a reconsideration of the ruling thereon, and because of petitioner's earnest insistence I have again carefully considered the matter and am now more firmly convinced than ever that the inconsistency of which petitioner complains is wholly nonexistent. In passing on to the subject of deviation, I shall pause only to state that the claimants by founding their claims on a deviation have not repudiated the contract of affreightment. That is not their position; they insist upon the valid contracts made between them and the petitioner, and insist upon the deviation as a fundamental breach of those contracts.

In this case there are a number of material facts that are not in dispute. It is not denied that the course actually taken by the Pelotas was the course ordered by the petitioner's president and was fully known to petitioner's executive officers before the commencement of the voyage. This course which has been generally referred to in the pleadings is more specifically described in the testimony, a consideration of which discloses not only that the direct route between the Brazilian coffee ports and the port of New Orleans is well recognized, but that the Pelotas actually followed this customary route on her prior voyage. On this occasion the Pelotas, after sailing from Victoria, followed the usual course taken by vessels making the run from Brazilian ports to New Orleans until she arrived off Point Galera, Trinidad, from which point custom required that she shape a course directly to a point east of the Island of Jamaica. The course taken by the Pelotas, however, was through the narrow waters separating Margarita Island and the mainland of South America and thence to the port of La Guaira, from which port she sailed for the point east of Jamaica to which she should have sailed directly from off Trinidad. She was thus brought back on her direct course after having spent approximately six days in waters entirely different from those encountered on the direct route to New Orleans during which time the vessel had been subjected to the dangers of navigating the narrow channel between Margarita Island and South America; had wended her way among the reefs and islands approaching La Guaira; had entered the port and been subjected to the additional dangers involved in entering a port; and thence had wended her way through the islands and reefs around Curacao; whereas the direct route would have taken the vessel through practically nothing but open water without reefs, islands, or dangers of any character. In addition to the hazards described and the consequent delay, the course added 96 miles to the direct route. The Pelotas then sailed across the Caribbean Sea and through the Yucatan Channel on a course which took her north of the Island of Jamaica. After passing the Grand Cayman, she should have

shaped a course to a point off Cape San Antonio at the west end of the Island of Cuba, and thence have proceeded through the open gulf on a northerly route to New Orleans, as is the customary route, but instead she took a westerly course north of the Bank of Campeche or Yucatan and then a southwesterly course towards the port of Vera Cruz. The course taken by the Pelotas required her to skirt the shoal waters and reefs that lie off the north coast of Yucatan and likewise to encounter the dangerous reefs outlying the port of Vera Cruz; and had she not stranded this course would have added 881 miles to her voyage and approximately four days in time to her direct route.

Having in mind the uncontroverted fact that none of the officers of the Pelotas had ever been to the ports of La Guaira or Vera Cruz and that on the prior voyage of the Pelotas she had taken the direct course to New Orleans without stopping at either port, the natural inquiry is: Was there any justification in custom for the course pursued by the Pelotas? An examination of the testimony reveals that only one of petitioner's vessels had ever prior to this voyage of the Pelotas put in at La Guaira or Vera Cruz on a voyage to New Orleans. This vessel was the Barbacena, and she called at La Guaira and from thence sailed to New Orleans, at which port she arrived three days after the Pelotas sailed on the voyage involved in this litigation. It is therefore obvious, in so far as petitioner's vessels are concerned, that there was no custom to make calls at these ports. It further appears that the route actually taken by the Pelotas was not the customary course pursued by the vessels of other owners engaged in the trade between Argentinian and Brazilian ports and New Orleans; that during the three-year period from September 15, 1920, to September 15, 1923, 156 vessels entered at New Orleans after voyages from the east coast of South America, and of this number not one except the Barbacena had put in at La Guaira or Vera Cruz. This undisputed testimony clearly warrants the conclusion that it was not the general usage or custom for steamers bound from Brazilian ports to New Orleans to call at La Guaira and Vera Cruz. This question of custom was considered by the court in Smith v. U. S. Shipping Board Emergency Fleet Corp. (The West Aleta) (D. C.) 2 F. (2d) 390, 391, 1924 A. M. C. 1318, and the court there said:

"The respondent has also relied upon custom, but as the Court of Appeals of the District of Columbia said in the case of United States Shipping Board Emergency Fleet Corporation v. Levensaler, 53 App. D. C. 322, 290 F. 297 [Summary, 1923 A. M. C. 1116]:

" 'Before a custom or usage can acquire the force of law, it must appear that it is general and uniform in the business to be affected by it, and that it has been peaceably acquiesced in without dispute for a long period of time.'

"I cannot say that the business usage, whereby no more than 18 ships at most of the respondent had usually proceeded from the Pacific Coast to Hamburg before discharging at Rotterdam, and had only done this for a period of about a year, can be regarded as a general and uniform custom having the force of a law, of which shippers should take notice."

Now the petitioner does not contend that the general usage or custom warranted the Pelotas in taking the course she actually pursued, but insists that by the terms of the bill of lading, especially clause 2, the Pelotas was justified in proceeding to the ports of La Guaira and Vera Cruz. The bills of lading covering the shipment of this cargo are in Portugese and there are several translations thereof. The one which I understand is not in dispute provides: "Shipped by * * * aboard the steamship Pelotas whereof * * * is Master, at present anchored in this port and intended to sail for New Orleans, the packages noted at the margin to be transported to New Orleans, or so near thereto as she may safely get, and there to be delivered alongside the vessel to * * * or to their order, the shippers being subject to the following conditions. * * *" The bills of lading then set forth a number of exceptions from liability which do not bear on the present discussion. In clause 2 of the bills of lading it is provided as follows:

"If, by any cause arising from bad weather or any other case of force majeure or from any of the operations of the steamers carrying mail or from the delay of the Consignees, it becomes impossible to effect discharge of the goods at the port of destination and within the stipulated time for the stay of the steamer, the Master is to be at liberty to proceed with the Voyage according to his itinerary and calls, the cargo to be returned to port of destination by the

same or other steamer, the Shipper or Consignee having no right to.  *  *  *"

The petitioner concedes that this is the only clause in the bill of lading which contains stipulations about the conduct of the voyage, and urges that the reference therein made to the master's "itinerary and ports of call" refers to the itinerary contained in the written sailing orders to the master, and that the foregoing reference thereto makes that "itinerary" with its scheduled ports of call just as much a part of the bill of lading as if it were printed on the face thereof. By this process of reasoning petitioner arrives at the conclusion that the bills of lading authorized the master to proceed according to his itinerary and that he did so; consequently, the Pelotas did not deviate in any manner.

It is clear from the language employed in the bills of lading that this clause applies only to a situation arising at the port of destination, and it would be placing a strained construction on this language to hold that it authorized the vessel to proceed to ports outside the ordinary route before undertaking to proceed to the port of destination. This clause comes into operation only in the event that the steamer proceeds to the port of discharge or as near thereto as she is able to get and then finds it impossible to discharge the cargo because of the happening of one or more of the four specified causes. Then, and then only, is she at liberty to proceed to her next port without discharging the cargo. In my opinion this clause is not applicable to the facts in the instant case, and if it were petitioner could derive little comfort therefrom, for even though the vessel was at liberty to deviate, it would not justify her calling at any port outside of the usual route. The law is well settled that the terms of a bill of lading are to be construed strictly against the carrier, and this rule of strict interpretation applies with equal force to any language purporting to grant a liberty to deviate. In The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 262, 71 L. Ed. 491, the bill of lading contained the following provision:

"To call at intermediate ports or any port or ports in or out of the customary route in any order, to receive and discharge coal,  *  *  *

" 'The ship has liberty of filling up and/or bunkering at any port or ports in or out of the way.'

" 'Filling up only in ports on the westwards of New York.' "

The Willdomino was proceeding on a voyage from Messina to New York and put in at North Sydney, Nova Scotia, for bunkers, and the court said:

"The Circuit Court of Appeals [300 F. 5], we think, rightly held that the Willdomino made an inexcusable deviation from the permitted course when she went to North Sydney."

In Scrutton on Charter Parties (1925) on page 297, note 1, the law is stated as follows:

"All these clauses must be construed in the light of the commercial adventure undertaken by the shipowner. Thus a clause giving leave 'to call at any ports,' will only allow the shipowner to call at ports which will be passed in the ordinary course of the named voyage in their geographical order; the words 'in any order,' will allow the shipowner to depart from geographical order; but even when there are general words giving liberty to call at ports outside the geographical voyage, these will be cut down, by the special description of the voyage undertaken, to ports on the course of that voyage."

This passage was quoted with approval by the Circuit Court of Appeals for this, the Fifth, Circuit in the case of Austrian Union Steamship Co. v. Calafiore, 194 F. 377.

In Hurlbut v. Turnure (D. C.) 76 F. 587, 590, the bill of lading reserved to the vessel the liberty to "call at any port or ports for whatever purpose." On a voyage from Cienfuegos to New York, the vessel put in at Newport News for coal, and the court held the carrier liable for a deviation, and in construing the deviation clause said:

"It has been repeatedly construed and adjudged not to authorize any departure to ports away from the ordinary course of the voyage, or for any purpose disconnected with the voyage."

It will serve no useful purpose to multiply authorities to further illustrate the strictness with which all the courts have held the carrier to its duty to proceed directly on the customary route.

Under the authorities it is clear that the deviation to Vera Cruz was inexcusable, and that even the deviation to La Guaira was quite sufficient in itself to render the carrier liable as an insurer. In The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 262,

71 L. Ed. 491, supra, the Supreme Court said:

"The Circuit Court of Appeals, we think, rightly held that the Willdomino made an inexcusable deviation from the permitted course when she went to North Sydney. Consequently she became liable as an insurer for any damage suffered by the cargo. St. Johns Corp. v. Companhia Geral, etc., 263 U. S. 119, 124, 44 S. Ct. 30, 68 L. Ed. 201; The Citta Di Messina (D. C.) 169 F. 472, 474, 475; The Sarnia (C. C. A.) 278 F. 459. ֍ * *

"It is clear enough that for some reason not quite definitely disclosed the officers of the vessel under direction of the owners, while realizing that there was not enough coal on board for such voyage, wished to create the impression that she left Ponta Delgada, bound directly for New York, when in truth they intended to take her to North Sydney under pretense of an emergency.

"In such circumstances by proceeding for five or six days in the direction of New York the vessel deviated from any permissible course to North Sydney, even if it be true, as her counsel now maintain, that she had the right to go and intended to proceed to the latter port from Ponta Delgada.

"If, on the other hand, the vessel started from Ponta Delgada with the intention of going to New York, the only emergency claimed to justify departure from the ordinary course and procedure to North Sydney arose from willful failure to take on sufficient coal.

"An emergency sufficient to excuse a departure cannot arise out of circumstances deliberately planned nor from gross negligence.

"Whether the intention was to proceed directly from Ponta Delgada to New York, as counsel for the petitioner are said to have maintained below, or to North Sydney, as they now insist, there was inexcusable departure.

" 'In the law maritime a deviation is defined as a "voluntary departure without necessity, or any reasonable cause, from the regular and usual course of the ship insured." ' Constable v. National Steamship Co., 154 U. S. 51, 66, 14 S. Ct. 1062, 1068, 38 L. Ed. 903. 'The voyage must be prosecuted without unnecessary delay or deviation. The shipowner's undertaking is that he will be diligent in carrying the goods on the agreed voyage and will do so directly without any unnecessary deviation.' Carver on Carriage of Goods by Sea (6th Ed.) 393."

In Niles-Bement-Pond Co. v. Dampkieaktieselskabet Balto (C. C. A.) 282 F. 235, 237, the court said:

"The failure to deliver the goods at the port named in the bill of lading, and carrying them further to another port, is an over carriage, and constitutes a deviation, and is negligence for which the carrier is liable."

Continuing, the court said:

"Since, under our decision in the Sarnia Case, supra, a failure to carry as required by the terms of the bill of lading or a deviation of the voyage gives the shipper the right to consider the goods as converted by the deviator, and the ship responsible for damages due to breach of the contract of carriage, without any reference to the question of whether the deviation had any bearing on the particular loss complained of, the carrier here must be held for the full damages flowing from the breach."

In The St. Paul (D. C.) 277 F. 99, 108, the court said:

"The cargo owners, under their contract, were entitled to such delivery of their goods. To the extent that those goods were not so delivered in sound condition, and that costs and expenses were incurred in connection therewith, the cargo owners have been damaged. Because there was deviation, unexcused, because of failure of compliance with the Harter Act, the principle applies that the shipowner becomes an insurer and is liable for all loss and damage, even unavoidable casualty. Carver on Carriage by Sea (6th Ed.) § 287; The Citta Di Messina, supra. Once the deviation occurs, it becomes immaterial how the damages are occasioned."

For other cases in point, see The Maggie Hammond, 9 Wall. 435, 19 L. Ed. 772; The Indrapura (D. C.) 171 F. 929.

These decisions clearly establish the principle that every bill of lading in default of special provision contains an implied warranty that the voyage will be prosecuted without unnecessary delay of deviation, and that if the vessel does unjustifiably deviate from her direct course the carrier from that moment on becomes the insurer of the goods and it becomes immaterial how the damages are occasioned.

The petitioner having personally ordered the deviations to La Guaira and Vera Cruz can obtain no exemption under the Harter Act (46 USCA §§ 190–195) nor under the provisions of Rev. St. § 4283 (46

USCA § 183). In re Meyer et al. (D. C.) 74 F. 881; The Frederick Luckenbach (D. C.) 15 F.(2d) 241.

█ Now the petitioner contends that considerable publicity was given to the voyage of the Pelotas, and further that all the shippers either had knowledge or are charged with having knowledge of the fact that the Pelotas was to proceed to New Orleans by way of La Guaira and Vera Cruz. However, I can see no necessity for rehearsing the testimony in this regard, because in my opinion the knowledge of the shippers is immaterial and proof thereof is inadmissible under the parol evidence rule. In The Delaware, 14 Wall. 579, 20 L. Ed. 779, the court said:

"Evidence of usage is admissible in mercantile contracts to prove that the words in which the contract is expressed, in the particular trade to which the contract refers, are used in a particular sense and different from the sense which they ordinarily import; and it is also admissible in certain cases, for the purpose of annexing incidents to the contract in matters upon which the contract is silent, but it is never admitted to make a contract or to add a new element to the terms of a contract previously made by the parties. Such evidence may be introduced to explain what is ambiguous, but it is never admissible to vary or contradict what is plain. Evidence of the kind may be admitted for the purpose of defining what is uncertain, but it is never properly admitted to alter a general rule of law, nor to make the legal rights or liabilities of the parties other or different from what they are by the common law. * * *

"Verbal agreements, however, between the parties to a written contract, made before or at the time of the execution of the contract, are in general inadmissible to contradict or vary its terms or to affect its construction, as all such verbal agreements are considered as merged in the written contract.

"Apply that rule to the case before the court and it is clear that the ruling of the court below was correct, as all the evidence offered consisted of conversations between the shippers and the master before or at the time the bill of lading was executed."

In The Golden Rule (C. C.) 9 F. 334, the court ruled out evidence of conversations held with a representative of the shipper as to the destination of the cargo and said:

"Such a defence cannot be listened to, as otherwise every bill of lading could be altered or varied by the recollections of a steam-boat mate, or the interference of disinterested parties. The carrying contract, reduced to writing in a bill of lading, can no more be altered or varied by parol evidence than any other written contract. See The Delaware, 14 Wall. 579 [20 L. Ed. 779]."

In Dietrich v. U. S. Shipping Board Emergency Fleet Corp. (C. C. A.) 9 F.(2d) 733, 741, the court commented on The Delaware and said:

"In the Supreme Court, in The Delaware, 14 Wall. 579, 20 L. Ed. 779, it was held that the bill of lading imported a contract and that evidence to vary it ought not to be admitted."

For other cases in point, see The Waldo, 28 Fed. Cas. 1356, No. 17056; The Sidonian (D. C.) 34 F. 805; Fass v. U. S. Shipping Board Emergency Fleet (D. C.) 9 F.(2d) 1004.

Considering these authorities and all the facts and circumstances of the case, I have arrived at the conclusion that the Pelotas, under the orders of the president of petitioner, made two inexcusable deviations from the direct, proper, and customary course when she went to La Guaira and Vera Cruz. Consequently, she became liable as an insurer for any damage suffered by the cargo without right of limitation. This disposes of the entire case save for the question of salvage which will now be considered.

On the evening of September 15, 1923, the Pelotas stranded on Galleguilla Reef while entering the Harbor of Vera Cruz. Unsuccessful efforts to release her were made by the tug Berwind and three Mexican gun boats, and on September 22d her master entered into a "no cure, no pay," salvage contract with the Huasteca Petroleum Company. Subsequently, the Merritt-Chapman & Scott Corporation, owner of the salvage tug Warbler, was called in by the Huasteca Petroleum Company to aid it in carrying out its contract, but no arrangements whatever of any character or description were made by any one representing the Pelotas with this concern.

On the 6th of October, the Pelotas was released from the strand as a result of the salvage services of claimants, and she thereupon proceeded under her own steam into the Harbor of Vera Cruz. Thereafter it was determined that the damaged coffee should be jettisoned out at sea, and she made several trips out to sea and back to port under her

own power and unassisted. The salved cargo was then transshipped to New Orleans on the steamship Jalisco, and the Pelotas shortly thereafter proceeded to New Orleans under her own power, towed and conveyed by the salvage tug Warbler. Upon arrival at New Orleans the petitioner received the vessel from the salvors and surrendered her in this proceeding, and she was afterward sold by the marshal at public sale for $26,000. It is conceded that various charges have been ordered paid by the court out of the res, so that the balance of the fund now on hand is slightly in excess of $21,000.

The salvage services rendered the Pelotas consisted in saving to the petitioner and the other claimants in this proceeding the value of the Pelotas, and this court is therefore not concerned with the two suits for salvage brought by the present salvor claimants in another jurisdiction wherein they are seeking further salvage from cargo interests.

The salvors claim that they actually expended $50,985.31 in their efforts to salvage the Pelotas and her cargo, and of this amount $15,463.49 is alleged to have been incurred for the account of hull. They further say that they are entitled to interest on these out of pocket disbursements and that their claim for salvage in the amount of $21,000, including bounty, disbursements, expenses, and interest should be recognized.

Apparently all parties to the present litigation agree, or at least do not deny, that the salvors' disbursements in respect of hull, with interest thereon, are at least equal to the fund in court, and I am satisfied this is true and that the expenditures exceed any award that can be made for salvage.

■ The two elements of a salvage award are stated by Hughes on Admiralty (2d Ed.) pp. 142, 143:

"A. Compensation for actual outlay and expenses made in the enterprise.

"B. The reward as bounty, allowed from motives of public policy as a means of encouraging extraordinary exertions in the saving of life and property.

"The first of these items is practically a constant quantity; as a salvor, if his service is important, is always entitled, at least, to be repaid his expenses and to be paid for his labor.

"The second element of salvage, or the bounty element, is the variable quantity in salvage awards. Being given on motives of public policy, it is more or less according to the merits of the service and the ability of the owners to contribute out of the funds saved."

This division of the elements of salvage is supported by the authorities. The Kimberley (D. C.) 40 F. 289; The Rita (C. C. A.) 62 F. 761.

■ Having the first of these two items in mind, the natural inquiry is: Were the services rendered by the salvors important? This question must be answered in the affirmative, as the salvage work was a complete success as to the vessel; the evidence clearly warranting the conclusion that the only damage sustained by the hull had occurred before the salvors arrived. From this it would appear that claimants are entitled to be awarded the entire available fund derived from the sale of the Pelotas; but to do so would be doing violence to other established rules of salvage which provide that salvors are limited in their award to the value of the property saved and are not permitted to be awarded the entire property. The true or net value of the Pelotas is a sum slightly in excess of $21,000, and not the amount of $26,000 as salvor claimants contend.

In The L. W. Perry (D. C.) 71 F. 745, 746, the court had occasion to discuss the principles here involved and said:

"While salvage is of the nature of a reward for meritorious service, and for determination of its amount the interests of the public and the encouragement of others to undertake like service are taken into consideration, as well as the risk incurred, and the value of the property saved, and where the proceeds for division are small, the proportion of allowance to the salvor may be enlarged to answer these purposes, nevertheless, the doctrine of salvage requires, as a prerequisite to any allowance, that the service 'must be productive of some benefit to the owners of the property salved; for, however meritorious the exertions of alleged salvors may be, if they are not attended with benefit to the owners, they cannot be compensated as such.' Abb. Shipp. (London, Ed., 1892) 722. The claim of the libelant can only be supported as one for salvage. It does not constitute a personal demand, upon quantum meruit, against the owners, but gives an interest in the property saved, which entitles the salvor to a liberal share of the proceeds. Allowance of the whole cannot be made without repudiating the doctrine of salvage; and, as remarked by Judge Betts, in The Waterloo, 1 Blatchf. & H. 114, Fed. Cas. No. 17,-257, 'would be a return to the barbarous practice of giving the finder all he finds.' There

582

must be a residuum secured to the owner. 'His rights are not to be deemed derelict.' Id. In Smith v. The Joseph Stewart, Crabbe, 218 Fed. Cas. No. 13,070, a similar claim was denied, and it is pertinently said in the opinion: 'If the salvors are to take all, the loss would be as total to the owner as if his property had been swallowed up by the sea;' in effect, the owner would be required 'to pay for saving when nothing is saved.'

"One of the grounds for liberality in salvage awards is the risk assumed by the salvor—that he can have no recompense for service or expense unless he is successful in the rescue of property, and that his reward must be within the measure of his success. He obtains an interest in the property, and in its proceeds when sold, but accompanied by the same risk of any misfortune or depreciation which may occur to reduce its value. In other words, he can only have a portion in any event; and the fact that his exertions were meritorious, and that their actual value, or the expense actually incurred, exceeded the amount produced by the service, cannot operate to absorb the entire proceeds against the established rules of salvage."

I find that the Merritt-Chapman & Scott Corporation is a subcontractor without right herein to a maritime lien or demand against the owners, and consequently it must look to the contractor and not to the vessel or her proceeds for payment. The G. Barber (D. C.) 29 F. 269; The Juniata (D. C.) 277 F. 438. The claim of the Merritt-Chapman & Scott Corporation will accordingly be dismissed with costs.

Considering the facts stated and all the other surrounding facts and circumstances of the case, I am persuaded that 50 per cent. of the net proceeds remaining undisbursed from the sale value of the steamship Pelotas should be awarded to claimant, the Huasteca Petroleum Company, for salvage, and a decree may accordingly be so entered with costs.

I am also of the opinion that the petition for limitation of liability should be denied, and in order that the case may be carried to a complete settlement of all claims, the usual order of reference is hereby made to the commissioner to report on the amount of the claims of the claimants and intervener so that decrees may be entered in their favor against the res and against the petitioner in personam.